## ROLAND ELECTRICAL CO. *v.* WALLING, WAGE AND HOUR ADMINISTRATOR.

No. 45.   Argued October 8, 1945.—Decided January 28, 1946.

658

*Mr. O. R. McGuire* for petitioner.

*Miss Bessie Margolin,* with whom *Acting Solicitor General Judson, Messrs. Robert L. Stern* and *Albert A. Spiegel* were on the brief, for respondent.

MR. JUSTICE BURTON delivered the opinion of the Court.

The questions presented are (1) whether petitioner's employees are engaged "in the production of goods for commerce" so as to bring them within the coverage of §§ 6 and 7 of the Fair Labor Standards Act of 1938 (52 Stat. 1060, 1062–3, 29 U. S. C. §§ 206 and 207), and (2), if so, whether they are exempted from the Act because "engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce" within the meaning of § 13 (a) (2). 29 U. S. C. § 213 (a) (2).

Respondent sought a permanent injunction in the United States District Court restraining petitioner from continued violation of the minimum wage, maximum hour and report-making provisions of the Act. 29 U. S. C.

§§ 206, 207, 211 (c). As to the coverage by the Act, the District Court said that "the view of the Administrator should not be accepted," but it rested its dismissal of the complaint upon the ground that the petitioner was exempted under § 13 (a) (2). 54 F. Supp. 733, 736. The Circuit Court of Appeals, on the other hand, held that petitioner's employees "were engaged in the production of goods for commerce" and that the petitioner was not a "retail or service establishment" within the exemption prescribed in § 13 (a) (2). It accordingly reversed the order of dismissal and remanded the cause for further proceedings in accordance with its opinion. 146 F. 2d 745. We granted certiorari especially because of the divergence of opinions among the Circuit Courts of Appeals as to the interpretation of § 13 (a) (2).[1]

Most of the relevant facts were stipulated. Petitioner is a Maryland corporation "having its principal office, place of business and a manufacturing plant" in Baltimore. It is there engaged in "commercial and industrial wiring, electrical contracting, and dealing in electrical motors and generators, for private, commercial, and industrial uses."

Petitioner had "approximately 1,000 active accounts . . . 99 percent of which are commercial or industrial firms." Its "larger and most active accounts" were 33 in number. Of such 33 customers, one was a telephone company "engaged in interstate commerce"; four were "engaged in the repair of ships, tugs, barges, and other boats which were intended for movement in interstate com-

---

[1] Compare *Fleming* v. *A. B. Kirschbaum Co.*, 124 F. 2d 567, 572, and *Fleming* v. *Arsenal Bldg. Corp.*, 125 F. 2d 278, 280, both affirmed *sub nom. Kirschbaum Co.* v. *Walling*, 316 U. S. 517, without disposing of the question now presented; *Guess* v. *Montague*, 140 F. 2d 500; *Bracey* v. *Luray*, 138 F. 2d 8; with *Lonas* v. *National Linen Corp.*, 136 F. 2d 433, cert. denied, 320 U. S. 785; *Martino* v. *Michigan Window Cleaning Co.*, 145 F. 2d 163, cert. granted, 325 U. S. 849.

merce"; and "the remaining companies on said list, with the exclusion of the American Ice Company [a small account in the period stipulated to be representative], were engaged in the production of goods for commerce as defined in Section 3 of the Fair Labor Standards Act of 1938, shipping at least a substantial portion of their total production to points outside the State of Maryland." During the period stipulated, "every mechanic of the defendant [petitioner] worked, in practically every workweek, for some of the said [33] customers either in the repair of their motors, generators, the reconstruction of used motors sold to them, or in performing electrical work at their respective establishments." To carry on its entire business, the petitioner had 36 employees, consisting of a foreman, 4 trouble shooters, 14 mechanics, 11 helpers and 6 office employees. No claim of coverage is made on the ground that any of the petitioner's employees were engaged "in [interstate] commerce," but only that they were engaged "in production of goods for [interstate] commerce."

## I

As to coverage, the Act is unambiguous and the petitioner's employees come squarely within it as employees "engaged in the production of goods for commerce." This turns on §§ 6 (a), 7 (a), 3 (b), 3 (i) and 3 (j). Section 6 (a) provides: "Every employer shall pay to each of his employees who is engaged in commerce or *in the production of goods for commerce* wages at the following rates . . ." (Italics supplied.) Section 7 (a) likewise provides: "No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or *in the production of goods for commerce*" at wages less than $1\frac{1}{2}$ times the regular rate, where an employee is employed for more than the maximum number of hours prescribed. (Italics supplied.)

Section 3 includes the following:

"(b) *'Commerce' means* trade, commerce, transportation, transmission, or communication *among the several States* or from any State to any place outside thereof.

.     .     .     .     .

"(i) *'Goods' means* goods (including ships and marine equipment), wares, products, commodities, merchandise, or *articles or subjects of commerce of any character, or any part or ingredient thereof,* but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act *an employee shall be deemed to have been engaged in the production of goods if* such employee was *employed* in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or *in any process or occupation necessary to the production thereof,* in any State." (Italics supplied.)

Putting these definitions together in their own terms, § 6 (a), as applied to the facts of this case, provides in effect that "Every employer shall pay [not less than the required minimum wages] to each of his employees who is employed in any process or occupation necessary to the production, in any state, of any part or ingredient of any articles or subjects of trade, commerce or transportation, of any character, for trade, commerce or transportation among the several states." This does *not* require the employee to be directly "engaged in commerce" among the several states. This does *not* require the employee to be employed even in the production of an article which *itself* becomes the subject of commerce or transportation among the several states. It is enough that the employee be employed, for example, in an occupation which is neces-

sary to the production of a part of any other "articles or subjects of commerce of any character" which are produced for trade, commerce or transportation among the several states. This does *not* require an employee to be employed exclusively in the specified occupation. This does *not* require that the occupation in which he is employed be *indispensable* to the production under consideration. It is enough that his occupation be *"necessary to the production."* There may be alternative occupations that could be substituted for it but it is enough that the one at issue is needed in such production and would, if omitted, handicap the production.

The *necessity* to the petitioner's customers, in their productive work, of the sales made and the services supplied to them by the petitioner's employees is the foundation of petitioner's business. The essential need for motors and wiring in the conduct of electrically operated productive processes of manufacture is beyond question. When commercial or industrial producers, such as the petitioner's customers, use electric motors in the production of goods for interstate commerce, services such as those of petitioner's employees are necessary to the continuity of such production. Such sales and services must be immediately available to petitioner's customers or their production will stop. If not supplied to the customers by employees of the petitioner, such customers would have to employ comparable employees of their own or of other contractors.[2]

---

[2] The dependence of the commercial and industrial customers of the petitioner upon such sales and services is well presented in the petitioner's advertising circular:

"It costs more to operate a faulty motor than to buy a new one. But it isn't necessary to buy a new motor. We'll recondition your present motors to give you the same service and satisfaction as new ones. And we'll save you 25% to 50% on new motor costs. . . .

"When a motor suddenly goes dead or lags, when trouble in electrical equipment arises, you need service and you need it quick! Every second of delay means more dollars lost. How well do we ap-

The work of petitioner's employees has "such a close and immediate tie with the process of production for commerce, and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation 'necessary to the production of goods for commerce.'" *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 525–526. The relation of petitioner's employees to the production of goods for interstate commerce by petitioner's customers is fully as close and "necessary" as was that of the loft building watchmen and porters to the petitioner's tenants in *Kirschbaum Co.* v. *Walling, supra;* the manufacturing plant watchman of the respondent in *Walton* v. *Southern Package Corp.,* 320 U. S. 540; or the fireguards subject to call in *Armour & Co.* v. *Wantock,* 323 U. S. 126. In the latter case this Court said (p. 130):

". . . no hard and fast rule may be transposed from one industry to another to say what is necessary in 'the production of goods.' What is practically necessary to it will depend on its environment and position. . . . What is required is a practical judgment as to whether the particular employer actually operates the work as part of an integrated effort for the production of goods."

The foregoing conclusions follow so clearly from the language of the statute as to make unnecessary a discussion of the declared purpose or the legislative history of the Act to support them.[3]

---

preciate what speed means to our patrons, as well as dependable workmanship! . . .

"No job is too small or too large to handle promptly. Temporary replacements can be made immediately from our stocks. No charge is made for equipment that is loaned while repairs are being made."

[3] The decision does not rest on the small quantities of scrap annually sold, melted down and shipped in interstate commerce, nor on the small amount of work performed by the petitioner in Maryland directly for customers outside of the State, nor upon the small numbers of sales of rebuilt motors to customers outside of the State. The result reached makes it unnecessary to consider whether any or all of the petitioner's employees were engaged "in [interstate] commerce" as distinguished from the "production of goods for [interstate] commerce."

## II

The second question is whether or not petitioner's employees are exempted from the Act on the ground that petitioner is a "service establishment" within the meaning of § 13 (a) (2).[4] The language of that clause is capable of two interpretations. If read in a detached and broad sense, it can be made to exempt from the Act the employees of the petitioner together with hundreds of thousands of other employees like them, to the serious detriment of the effectiveness of the Act. However, if read in connection with the declared purpose of the Act and in the light of its legislative history and administrative interpretation, the clause does not reach employees "engaged in the production of goods for commerce" as were those in this case. When so read, the exemption reaches employees of only such retail or service establishments as are comparable to the local merchant, corner grocer or filling station operator who sells to or serves ultimate consumers who are at the end of, or beyond, that "flow of goods in commerce" which it is the purpose of the Act to reach. See § 2, *infra*. Without this clause such local establishments might find themselves technically covered by the Act, not because they were "producing goods for [interstate] commerce," but because, for example, they were retailing milk near a state line and, therefore, might be regarded as actually in interstate commerce when delivering retail sales of milk to local customers, all of whom were ultimate consumers of it for their personal use, but a small proportion of whom lived across the state line from the milk dealer. *Walling* v.

---

[4] "Sec. 13. (a) The provisions of sections 6 and 7 shall not apply with respect to . . . (2) any employee engaged in *any retail or service establishment* the greater part of whose selling or servicing is in intrastate commerce; . . ." 52 Stat. 1060, 1067, 29 U. S. C. § 213 (a) (2). (Italics supplied.)

*Jacksonville Paper Co.,* 317 U. S. 564, 571; *Phillips Co.* v. *Walling,* 324 U. S. 490, 497. Similarly, it was felt that without this exemption clause, the employees of a local merchant who purchased his goods from outside his State but retailed them all within his State to ultimate consumers across his counter, might, nevertheless, technically be covered by the Act as being actually "in [interstate] commerce" because of his purchases, although his sales all might be at "retail" and beyond the end of the "flow of goods in commerce." 83 Cong. Rec. 7393–7394, 7436–7438. The origin of this clause, § 13 (a) (2), had nothing to do with establishments "producing goods for [interstate] commerce."

It is rare, if not impossible, for an employee who is engaged in an occupation necessary to the production of goods for interstate commerce to be said to be at the same time an employee engaged in a retail or service establishment whose selling and servicing is confined to ultimate consumers. These employments are largely mutually exclusive. To the extent that sales or services are necessary for the production of goods for interstate commerce they generally are by that hypothesis not sales or services to an ultimate consumer for his personal use and, accordingly, are neither "retail" sales nor services of a comparable character, within the meaning of § 13 (a) (2).

The logic of this result is as clear as the declared purpose, legislative history and administrative practice which combine to produce it.

The purposes of the Act are declared as follows in § 2:

"(a) The Congress hereby finds that *the existence, in industries engaged* in commerce or *in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living* necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and per-

petuate such labor conditions among the workers of the several States; (2) *burdens commerce and the free flow of goods in commerce;* (3) *constitutes an unfair method of competition in commerce;* (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b) It is hereby declared to be the *policy of this Act, through the exercise by Congress of its power to regulate commerce* among the several States, to correct and as rapidly as practicable *to eliminate the conditions above referred to in such industries* without substantially curtailing employment or earning power." 52 Stat. 1060, 29 U. S. C. § 202. (Italics supplied.)

To fail to cover in this Act the multitude of employees who are engaged in establishments like that of the petitioner and which supply the materials and services currently needed for the maintenance of productive machinery used by those who produce goods for interstate commerce would take the heart out of this Act. Savings resulting from substandard labor conditions would be reflected directly into competitive costs. This would weaken the governmental mechanism for sustaining "the minimum standard of living necessary for the health, efficiency, and general well-being of workers" referred to as the purpose of the Act.[5]

---

[5] *Phillips Co.* v. *Walling,* 324 U. S. 490, 493. The Bill was introduced May 24, 1937, as S. 2475 and H. R. 7200, accompanied by a Presidential message. The sponsor of the Bill agreed that the Bill was "intended to carry out the suggestions made by the President in his message." 81 Cong. Rec. 4960, 4961. The President said "to protect the fundamental interests of free labor and a free people we propose that only goods which have been produced under conditions which meet the minimum standards of free labor shall be admitted to interstate commerce. Goods produced under conditions which do not meet rudimentary standards of decency should be regarded as contraband and ought not to be allowed to pollute the

The primary purpose of the Act is not so much to regulate interstate commerce as such, as it is, through the exercise of legislative power, to prohibit the shipment of goods in interstate commerce if they are produced under substandard labor conditions. Such a prohibition is an appropriate exercise of the power of Congress over interstate commerce. *United States* v. *Darby,* 312 U. S. 100, 115; *United States* v. *Carolene Products Co.,* 304 U. S. 144, 147. This Act seeks to eliminate substandard labor

channels of interstate trade." *Id.* at 4961. The President emphasized his purpose to follow the reasoning of Mr. Justice Holmes' dissenting opinion in the 5 to 4 decision in *Hammer* v. *Dagenhart,* 247 U. S. 251, 277. This Court has now overruled that decision and unanimously upheld the constitutionality of the Fair Labor Standards Act of 1938. *United States* v. *Darby,* 312 U. S. 100, 115–117. The Bill became known as the "Wage and Hour Bill." Later it received its official title of the "Fair Labor Standards Act of 1938." The respective Bills were referred to the Committee on Education and Labor in the Senate and the Committee on Labor in the House. Joint hearings were had before these Committees June 2–5, 7–15, 21 and 22, 1937. Hearings on S. 2475 and H. R. 7200, 75th Cong., 1st Sess. It was reported to the Senate July 8, 1937 with amendments. Sen. Rep. No. 884, 75th Cong., 1st Sess. After full discussion it was passed by the Senate July 31, 1937, with amendments. 81 Cong. Rec. 7957. In that form it was referred to the Committee on Labor of the House, and was reported out August 6, 1937 (H. Rep. No. 1452, 75th Cong., 1st Sess.)', without significant changes as to coverage or exemptions. After debate, it was recommitted to the Committee on Labor December 17, 1937 (82 Cong. Rec. 1835), including particularly the substitution of a single Administrator in place of the Fair Labor Standards Board proposed in the original Bill. It was again reported favorably by the House Committee on Labor April 21, 1938, with amendments. H. Rep. No. 2182, 75th Cong., 3d Sess. After debate, it was passed by the House May 24, 1938. 83 Cong. Rec. 7449. It went to conference between the two Houses and was reported out of conference with several amendments in substantially its present form and the conference reports were adopted in both Houses June 14, 1938. 83 Cong. Rec. 9158, 9246. It was approved by the President June 25, 1938. The questions of coverage and exemption are closely related to each other in the discussion in Congress and in the amendments adopted.

conditions, including child labor, on a wide scale throughout the nation.  The purpose is to raise living standards. This purpose will fail of realization unless the Act has sufficiently broad coverage to eliminate in large measure from interstate commerce the competitive advantage accruing from savings in costs based upon substandard labor conditions.  Otherwise the Act will be ineffective, and will penalize those who practice fair labor standards as against those who do not.

The original Bill provided for a labor standards board which was given broad authority to issue regulations and orders to carry out the provisions of the Act including authority to determine some questions of coverage.  It listed no specific exemptions such as are now contained in § 13. In the joint hearings on this Bill (Joint Hearings, 75th Cong., 1st Sess., on S. 2475 and H. R. 7200, pp. 1–89, see especially pp. 24–25, 24–29, 35 *et seq.*), the Chairman of the Senate Committee on Education and Labor asked the Assistant Attorney General (p. 35)—

"Would you explain under just what circumstances and under what circumstances only, it would be possible for the regulation of retail establishments and small business enterprises to come under this bill?"

to which he replied—

"It was not intended by this bill to apply generally to retailers or to apply to the service trades, such as the filling-station attendant, and the pants presser and small business generally.

.        .        .        .        .

"Practically, the situation in which a local merchant might be affected would be if he were moving his goods in the course of delivery across the State line to a substantial extent so that he were engaging in interstate commerce; but generally speaking, the policy of the bill is not to include the service trades and small businesses and the retailing enterprises."

Section 6 (a) of the original Bill proposed to exempt the employees of any employer employing less than a fixed minimum number of employees except in those circumstances where the Labor Standards Board found that the maintenance of appropriate fair labor standards by even such a class of employers was necessary or appropriate in order to carry out the purposes, or prevent the circumvention, of any provision of the Act. The requirement of a minimum size for an included establishment, and the provisions for the Board and its discretionary power were later eliminated but the purpose of all of these provisions is served to a substantial degree by the insertion of § 13 in their place.

While its language and coverage were changed in details, the Bill did not depart substantially from its original purpose. This purpose remains the key to the meaning of the words defining its coverage and also to those defining exemption from its coverage. There never was an intent expressed to exempt retailers other than the local merchants of the type dealing with the ultimate consumer. Section 13 (a) (2) clarified the exemption of such of these as were near state lines and of local merchants whose *purchases* might be interstate although the greater part of their sales were intrastate.[6]

---

[6] The original Senate Committee report said (Sen. Rep. No. 884, 75th Cong., 1st Sess., p. 5):

"The bill carefully excludes from its scope business in the several States that is of a purely local nature. It applies only to the industrial and business activities of the Nation insofar as they utilize the channels of interstate commerce, or seriously and substantially burden or harass such commerce. It leaves to State and local communities their own responsibilities concerning those local service and other business trades that do not substantially influence the stream of interstate commerce. For example, the policy in this regard is such that it is not even intended to include in its scope those purely local and small business establishments that happen to lie near State lines, and solely on account of such location, actually serve a wholly local community trade within two States."

See also, note 8, *infra; Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 571, and *Phillips Co.* v. *Walling,* 324 U. S. 490, 497.

In the Bill as reported to the House of Representatives, April 21, 1938, the declaration of purposes referred to "substandard labor conditions in occupations in commerce, in the production of goods for commerce, or *otherwise affecting commerce.*" [7] (Italics supplied.) The breadth of the phrase "affecting commerce" was so uncertain and difficult of definition that it was at first proposed in the Bill to grant to a labor standards board, and later to the Secretary of Labor, authority to determine what should be considered as actually "affecting commerce" within the meaning of the Act. This proposal proved unsatisfactory and Congress finally chose to forego the exercise of its full constitutional power and eliminated from the Act the clause "affecting commerce." The remaining coverage relates only to employees (1) "in [interstate] commerce,"—from whom § 13 (a) (2) exempts employees of retail and service establishments the greater part of whose selling or servicing is in intrastate commerce—and to those (2) "in production of goods for [interstate] commerce." The debates in Congress show an intent to restrict the word "retail" to such transactions with ultimate consumers as are commonly carried on at local dry goods, butchering, or grocery stores. The words "service establishments" and "servicing," however, were introduced in the final Conference Report and were not discussed on the floor.[8] 83 Cong. Rec. 9161, 9249.

---

[7] Section 2 (a), S. 2475 accompanying report No. 2182 on Union Calendar No. 804 in the House of Representatives, 75th Cong., 3d Sess.

[8] See, Debates in House of Representatives, 83 Cong. Rec. 7393–7394, 7436–7438. It is here that § 13 (a) (2) had its origin in an amendment presented by Representative Celler and accepted by Chairman Norton of the House Committee on Labor. It provided for the insertion of the words "but no such order shall be applicable to any retail industry, the greater part of whose sales is in intrastate commerce."

It was intended "to eliminate retailing" and to prevent the classification of employees of retail establishments as employees engaged

Returning to the text of the Act and to its authoritative administrative interpretation, further confirmation is apparent. In general usage the noun "retail" means "The sale of commodities in small quantities or parcels;—opposed to *wholesale*." The verb "retail" means "To sell in small quantities, as by the single yard, pound, gallon, etc.; to sell directly to the consumer; as, to *retail* cloth or groceries." Webster's New International Dictionary, Unabridged (2d ed., 1938).

In the suggested use of the word "retail" as opposed to the word "wholesale," a distinction appears not merely between the size and volume of the sales but between types of purchasers. For example—

---

in interstate commerce because of either purchases or sales made by such employers across state lines. Representative Celler said (83 Cong. Rec. 7438):

"The courts will look to the debates in this House for what is meant by these words. . . . If you want to eliminate retailing, you should say so in clear-cut language, and this amendment which I offer indicates in the clearest way that retailing is exempted. . . . Accept it and then retail dry goods, retail butchering, grocers, retail clothing stores, department stores will all be exempt."

Representative Norton replied: ". . . in view of the great misunderstanding there must be about this retailing feature of the bill, the committee will accept the amendment. There has been a great deal of doubt as to the understanding of that particular section, and I think this amendment will not weaken our bill, but will in fact strengthen it."

The amendment thereupon was agreed to. (Ayes, 145—Noes, 56.)

Representative Johnson of Oklahoma, in withdrawing an amendment which would have expressly stricken out interstate purchases as a basis for bringing within the Act employees of an industry making such purchases, then said:

". . . the amendment . . . offered by the gentleman from New York [Mr. Celler], which amendment has been approved by this body, is to protect the little corner store, filling station, and other retailers who purchase a substantial part of their goods across the State line."

"Wholesaling includes all marketing transactions in which the purchaser is actuated solely by a profit or business motive in making the purchase.

"Retailing includes all marketing transactions in which the purchaser is actuated solely by a desire to satisfy his own personal wants or those of his family or friends through the personal use of the commodity or service purchased." (Beckman and Engle in Wholesaling Principles and Practice (1937) p. 25.)

Similarly the *Encyclopedia of Social Sciences* states that "The distinguishing feature of the retail trade . . . consists in selling merchandise to ultimate consumers," (Vol. 13, p. 346), whereas wholesaling is said to cover sales "to a retailer, a wholesaler or an industrial consumer so long as the purpose of the customer in buying such goods is to resell them in one form or another or to use them for business needs as supplies or equipment." (Vol. 15, p. 411.)

Governmental usage makes the same distinction on the basis of the use for which the goods are purchased. The Bureau of the Census states in its definition of "wholesale" that "in general, the distinguishing characteristic is that goods sold at wholesale are to be used for business purposes (such as materials for further processing and fabrication, merchandise for resale unchanged, etc.), rather than for personal or household consumption." U. S. Census of Business, 1939, Instructions to Enumerators For Business and Manufacturers, p. 18; also Vol. I, Retail Trade, p. 1; Vol. II, Wholesale Trade, p. 1. It classifies as "wholesale sales," sales of goods or merchandise "to trading establishments of all kinds, to institutions, industrial, commercial, and professional users, and sales to governmental bodies." (*Ibid.*) The Bureau of the Budget, in its *Standard Industrial Classification Manual*, likewise classifies "wholesale trade" to include "all establishments or places of business engaged primarily in selling merchandise to retailers, to industrial or commercial

users, or to other wholesalers . . ." Vol. II—Nonmanufacturing Industries, 1942, p. 35. It defines "retail trade" to include "establishments engaged in selling merchandise for personal or household consumption and rendering services incidental to the sales of goods." (*Ibid.*) Similarly the Social Security Board, in its *Industrial Classification Code,* Vol. I, Description of Industries, 1942, pp. 99–100, prepared for use of the Board and State agencies administering employment security legislation, distinguishes between wholesale and retail establishments on the basis of whether the goods they sell are to be used for business purposes or for personal or household purposes.

The word "retail" because of its ready contrast with "wholesale" is generally more restrictive than the word "service." The two, however, are used so closely together in this statute as to require them to be interpreted similarly. This makes it appropriate to restrict the broader meaning of "service" to a meaning comparable to that given the narrower term "retail." The words are put on a like level especially by their use in the alternative with the single word "establishment" in the phrase "any *retail or service establishment* the greater part of *whose selling or servicing* is in intrastate commerce." (Italics supplied.) Accordingly, in proportion as the meaning of the word "retail" is restricted to sales made in small quantities to ultimate consumers to meet personal rather ·than commercial and industrial uses of those articles, so it is correspondingly appropriate to restrict the word "service" to services to ultimate users of them for personal rather than commercial purposes. This is supported by judicial interpretation of the clause.[9]

---

[9] *Guess* v. *Montague,* 140 F. 2d 500, 503; cf. *Fleming* v. *Arsenal Bldg. Corp.,* 125 F. 2d 278, 280, affirmed *sub nom., Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 526.

The administrative interpretation by the Administrator of the Wage and Hour Division of the terms "retail and service establishments," "retail sales" and "services" as used in this connection reinforces the interpretations above stated,[10] and this Court, in speaking of interpretations of this Act by the Wage and Hour Division, has said: "In any case such interpretations are entitled to great weight."

---

[10] Interpretative Bulletin No. 6 of the Wage and Hour Division of the United States Department of Labor and under the title of "Retail and Service Establishment—The Scope and Applicability of the Exemption Provided by Section 13 (a) (2) of the Fair Labor Standards Act of 1938" originally issued December, 1938, and revised June, 1941, 2 C. C. H. Labor Law Service, ¶ 32,106.

Some of these interpretations are as follows:

"Section 13 (a) (2), was intended to apply typically to the grocery store, butcher shop, haberdashery, clothing store, filling station, beauty parlor, hotel, and similar commonly recognized retail and service establishments." Par. 3.

"A retail sale is a sale of goods for direct consumption and not for purposes of resale or redistribution in any form." Par. 12.

"A retail establishment sells goods to private individuals for personal or family consumption." Par. 14.

"The term 'service establishment' as used in section 13 (a) (2) may be considered to include generally that large miscellaneous assortment of business enterprises which are similar in character to retail establishments, but which may not be accurately classified as such. Such an interpretation is suggested by the manner in which section 13 (a) (2) is drafted. Service and retail establishments are considered in the same sentence and the same criterion of intrastate commerce is made applicable to both." Par. 22. See also, Pars. 23–29.

"As already indicated, establishments which perform a substantial amount of work for industrial or business users, government agencies, institutions, and similar customers may not be considered service establishments. A service establishment is one which performs service for private individuals for personal or family use." Par. 27.

In paragraph 29, the Administrator lists many examples of "establishments not considered service establishments under exemption" and says of them—

"Although we recognize that the foregoing companies *perform service*, it is nevertheless our opinion that establishments engaged in such businesses are *not in the ordinary case sufficiently similar in character*

*United States* v. *American Trucking Assns.*, 310 U. S. 534, 549. See also, *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140. The Administrator classifies as "non-retail" many types of sales closely comparable to those made by the petitioner in this case, of motors, generators and similar equipment to commercial and industrial customers for their use in producing goods for interstate commerce.[11]

---

*to retail establishments to be considered service establishments within the meaning of section 13 (a) (2)."* (Italics supplied.)

Among the companies so listed in paragraph 29, and to which the above quotation refers, are the following which have special significance in connection with this case: engineering firms, machine shops and foundries, establishments engaged in sharpening and reconditioning industrial tools, in resistance welding, in armature rewinding, or in making electric signs, companies engaged in the repair of business machines or in repairing elevators.

[11] "Thus, many establishments are engaged in selling goods which have only an industrial or business market, e. g., establishments engaged in selling production machinery, freight trailers, oil-well drilling machinery and equipment, etc. These establishments are *not retail establishments* within the meaning of section 13 (a) (2) since they do not sell regularly to the general consuming public." (Italics supplied.) Interpretative Bulletin No. 6, Par. 11, 2 C. C. H. Labor Law Service, ¶ 32,106. A footnote to paragraph 11 in the same bulletin contains the following statement: "Ordinarily the following types of goods have only an industrial or business market and are not sold to the general consuming public. Accordingly, sales of such goods, in the ordinary case, are not retail. It should be noted that the types of goods listed below are merely examples and do not comprise an exhaustive enumeration." The note then lists many illustrations some of which are closely comparable to the types of goods sold and serviced in this case. Among the illustrations are butchers' equipment, filling station equipment, construction equipment, machine tools, mechanical rubber goods (such as belting, packing, gaskets, and recoil pads), power engines, powerhouse equipment, welding equipment, hospital equipment (such as X-ray machines), plumbers' equipment, shoe repairers' equipment, commercial aircraft equipment, railroad equipment and commercial ship equipment.

Although in this case the motors sold by the petitioner were not purchased by its customers for resale or to be processed for resale, and although they were to be used and probably ultimately to be "consumed" in the hands of the petitioner's customers, these motors remained actively in use in the production of the "flow of goods in commerce." It is to this great field of the production of goods for interstate commerce that the Act is directed.

The record establishes the "commercial and industrial" character of the petitioner's customers. The petitioner's circular advertises its business as that of "electrical engineers, motor dealers, *commercial and industrial wiring.*" (Italics supplied.) The circular offers "service for *all types of commercial and industrial wiring.*" (Italics supplied.) The stipulation filed by the petitioner shows that 99% of its "active accounts as reflected in its Accounts Receivable Ledger . . . are *commercial or industrial firms.*" (Italics supplied.) These are not "retail" customers in the same sense as is the customer of the local merchant, local grocer or filling station operator who buys for his own personal consumption. The Fair Labor Standards Act is concerned with goods in the stream of commerce but not with those in "the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." See § 3 (i), *supra.*

For these reasons the employees of the petitioner were properly held to be engaged in the production of goods for interstate commerce under the coverage of the Fair Labor Standards Act and were not taken out of that coverage by the exemption stated in § 13 (a) (2). The judgment of the Circuit Court of Appeals accordingly is

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.