**McCOMB v. DEIBERT.**
Civ. A. No. 7523.

United States District Court
E. D. Pennsylvania.
Feb. 14, 1949.

Ernest N. Votaw, Philadelphia, Pa., for plaintiff.

Theo. R. Gardner, Allentown, Pa., for defendant.

GANEY, District Judge.

This is an action instituted by the Administrator of the Wage and Hour Division pursuant to section 17 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq., to enjoin the defendant from violating sections 15(a)(2) and 15(a)(5) of the Act because of his failure to pay his employees compensation for overtime and to maintain records in accordance with sections 7 and 11(c), respectively, of the Act. Injunctive action is opposed on the grounds that (1) defendant's employees are not engaged in interstate commerce or in the production of goods for such commerce within the meaning of 7(a) of the Act; and (2) if they are so engaged, the provisions of that section do not apply to them because they are engaged in a retail or retail service establishment within the meaning of Sec. 13 (a)(2) of the Act, or they are employed in a bona fide local retailing capacity within the meaning of Sec. 13(a)(1) of the Act.

The parties have agreed that the business conducted by the defendant during the six-month period from July 1 to December 31, 1946, is representative of the character of his business generally. With reference to this representative period of time unless otherwise indicated, the court, from the evidence presented to it, makes the following

Findings of Fact.

1. The plaintiff is William R. McComb, Administrator of the Wage and Hour Division of the United States Department of Labor.

2. The defendant owns and operates an automobile dealer's establishment at 543 N. 15th Street in Allentown, Pennsylvania, at which place he sells new GMC and Divco trucks, GMC and Divco parts and accessories, used trucks and used passenger cars. Servicing and repairing of trucks and passenger cars are also performed there.

3. The defendant held a franchise from the General Motors Corporation granting him the exclusive right to see new GMC Trucks and the right to sell GMC truck parts for the use of residents of Allentown, and the right to sell new

GMC trucks and parts for the use of residents in the territory surrounding Allentown. However, General Motors Corporation reserved the right to sell any of its products to either the United States or any state government or any department or bureau thereof or any foreign government or any municipal corporation or the American Red Cross, fleet users of trucks, any division or subsidiary of the General Motors Corporation and to such others as it might designate. He also held a franchise from the Divco Corporation to sell new Divco trucks and parts in Allentown and its surrounding territory. This corporation reserved the right to make the following classes of sales: to any government or governmental agency, specially designed models, sales which are intended for export, and to so-called National buyers. Under these franchises the defendant was required to maintain a sufficient stock of truck parts to adequately meet the requirements of his customers.

4. His business is regularly conducted in a one story building 120 feet square that is divided into three rooms: two small rooms, one of which is used for an office and the other as a department for truck parts and accessories; and a large room used for repair work and for the displaying of trucks.

5. This establishment was opened to the public from 8 A.M. to 5 P.M. six days a week. At present this same schedule is followed except that it closes at 12 noon on Saturdays.

6. During the stipulated period the defendant sold thirty-two new Divco trucks, eleven new GMC trucks, a new freight trailer, ten used trucks, a used school bus and a used passenger car. Five of the trucks had a rated load capacity of less than a ton, forty-three were one to one and one-half tons, and four ranged from three to five tons; the bus was one and one-half tons, the trailer over one and one-half tons.

7. New trucks were sold by him at the manufacturer's list price in the following manner:

(a) The purchaser indicated the type and model desired.

(b) The defendant ordered it from the manufacturer located in the State of Michigan.

(c) The manufacturer either shipped it to defendant's establishment via railroad or had it driven there.

(d) Defendant took title to it.

(e) Prior to the delivery of the truck to the known purchaser, defendant's employees prepared it for use.

(f) Upon receiving it, the purchaser took title thereto and paid for it at the list price in cash or cash plus a used motor vehicle.

8. The demand for new trucks exceeded the supply, and, as a consequence new trucks were difficult to obtain.

9. He regularly received on the average of five new trucks every three weeks from the manufacturers located in the State of Michigan. At the present time this average has increased.

10. The purchasers of defendant's motor vehicles were individuals residing in, or industrial or commercial enterprises located in, Allentown and its vicinity. Defendant made no sales or delivery of motor vehicles across State lines.

11. With the exception of two sales in which two trucks were sold at one time to a purchaser all sales of motor vehicles by him were of the single sale variety.

12. No motor vehicles were sold by or purchased from him for the purpose of resale.

13. With the possible exception of the used passenger car, no motor vehicles were purchased from him for personal, family or household use. Defendant's customers were actuated solely by a profit or business motive in making such purchases.

14. Dairies purchased thirty-one of his trucks principally for the purpose of delivering milk to household users. The remainder were purchased by haulers,

paper-hangers, a roofer, a seller of mineral water, a contractor, a soap manufacturer, and a brewery. The bus was bought for the purpose of transporting children to school; the trailer for hauling.

15. GMC trucks are essentially similar in type and model to trucks manufactured by other concerns, and are unsuited for personal, family or household use.

16. The Divco is a panel low-floor truck especially designed for the convenient and economical delivery of small parcels of merchandise where delivery stops are numerous and not too far apart.

17. While the Divco truck is used primarily by dairies, it may be used and is used in a variety of other businesses to make house to house or store to store delivery of merchandise.

18. Twenty-eight of the thirty-two new Divco trucks were sold by the defendant to individuals who, or concerns which, were engaged in the retail milk delivery business. Of the remaining four, two were sold to a brewery, and one each to a bakery and a seller of mineral water. Two used Divco trucks were sold to a dairy.

19. All Divco trucks, whether new or used, sold by the defendant had a rated load capacity of either one or one and one-half tons.

20. A chart of the motor vehicles sold by the defendant and the amounts received for them is as follows:

| Rated Load Capacity | 1½ Tons or Less | | Over 1½ Tons | | Over 1½ Tons to Farmers | |
|---|---|---|---|---|---|---|
| | Number | Value | Number | Value | Number | Value |
| (a) New Divco Trucks | 32 | $59,508.54 | — | — | — | — |
| (b) New GMC Trucks | 8 | 13,383.16 | 2 | $ 9,200.00 | 1 | $3,100.00 |
| (c) New Trailer | — | — | 1 | 1,700.00 | — | — |
| Total | 40 | $72,891.70 | 3 | $10,900.00 | 1 | $3,100.00 |

Total $86,891.70

| Rated Load Capacity | 1½ Tons or Less | | Over 1½ Tons | | Over 1½ Tons to Farmers | |
|---|---|---|---|---|---|---|
| | Number | Value | No. | Value | Number | Value |
| (a) Used Divco Trucks | 2 | $ 950.00 | — | — | — | — |
| (b) Used GMC Trucks | 4* | 4,125.00 | — | — | 1 | $2,000.00 |
| (c) Other Used Trucks | 4** | 2,725.00 | — | — | — | — |
| Total | 10 | $7,500.00 | — | — | 1 | $2,000.00 |

Total $9,500.00

\* Includes used Bus sold for $1,350.00
\*\* Does not include used passenger car sold for $650.00

21. Although his service and repair shop and parts department were opened to users of all types of motor vehicles, the bulk of defendant's customers were owners of trucks used for business or commercial purposes. The greater part of these trucks were owned by individuals who, or concerns which had purchased them from the defendant.

22. Some of his customers used their trucks to haul goods across State lines or to carry material which was used in or necessary for the production of goods for commerce among the States. These

included a manufacturer of paper boxes which sought repairs for its trucks about once a week—totalling $562.94; a hauler of grain whose repairs for his trucks amounted to $440; and a general hauling company which sought repairs for its trucks about once every six months.

23. Another of his customers, an interstate common carrier of freight, from time to time regularly purchased GMC parts. After deducting twenty-five percent discount given fleet owners of GMC trucks by the General Motors Corporation, this concern's purchases amounted to approximately $1,308.

24. Still another customer, a large steel producer, pursuant to a contract or understanding, annually issued a blanket requisition for GMC parts which it desired to purchase during the year for its trucks which were used to haul dolomite from the pit to the crusher. From time to time an employee of the steel company came to defendant's place to obtain the parts. Purchases amounted to $1,278.

25. He also sold parts to garages for resale purposes.

26. Defendant's gross sales of parts and accessories amounted to $16,730.54. This total does not include $2,075.84 representing the value of parts and accessories used in connection with the repair and reconditioning of the used trucks and passenger car accepted in trade by him. The latter figure, however, is included in the total, shown in the chart under paragraph 20 supra, received for used trucks and a passenger car.

27. A breakdown of the value of gross sales for parts and accessories is as follows: (a) for resale, $1,272.75; (b) at a discount and in quantity, $4,404.47; (c) at a discount but not in quantity, $2,000; and (d) others, $9,053.32. The sum of a and b amounts to thirty-three per cent of the value of the gross sales.

28. All Divco parts were sold at the manufacturer's list price without a discount. No such sales of parts and accessories were made across State lines by the defendant.

29. He charged a uniform rate for all services, repairs and installation of parts, receipts for which amounted to $3,717.93.

30. His gross income was $117,490.17. A breakdown of this sum is as follows: (a) New trucks and a trailer, $86,891.70; (b) Used trucks, $9,500; (c) Used passenger car, $650; and (d) Services, repairs, etc., $3,717.93. The receipts for the new trucks and trailer amounted to approximately seventy-three percent of his gross income.

31. In 1946 defendant's net income derived from his business was $208,742.72; in 1947 it rose to $350,863.56.

32. In the regular course of his business, the defendant employed five persons: two mechanics, a mechanic's helper, a parts salesman, and an office girl. At the present time he has employed an additional mechanic and office girl, and an outside salesman.

33. The mechanics, the mechanic's helper, and the parts salesman have worked consistently and are now working in excess of forty hours a week without having received time and a half for the hours worked by them in excess of forty hours. That is, they received and are now receiving the same hourly rate of pay for those hours worked by them in excess of forty during the work week as they received and are receiving for hours worked by them under forty. Defendant has no intention of paying these employees time and a half in the future for such overtime.

34. The defendant did not maintain an elaborate repair shop, and in general repairs by his employees were made with simple hand tools.

35. The various activities of defendant's mechanics and their helper are classifiable as follows: (a) Prepare new trucks for use prior to their delivery to the purchaser, (b) service, repair, and install parts on motor vehicles brought to defendant's establishment for such

purposes and (c) repair, recondition and install parts on motor vehicles accepted in trade by the defendant.

36. The mechanics and their helper were not directed to perform in one of the above classifications to the exclusion of the others or to work on a particular type of motor vehicle, but were assigned indiscriminately and interchangeably in any classification of their activities and to any motor vehicle irrespective of its make, size or character of commerce to which it was put.

37. The preparation of new trucks for use for the purchasers required at least four hours. This preparation consisted in checking the vital parts such as the motor and steering gear; adjusting the brakes and lights; greasing and oiling; and attaching accessories which were necessary or requested by the purchaser. Such preparation was and is a substantial and regularly recurring part of the mechanical employees' employment.

38. The lesser part of the services, repairs and installation of parts performed by the mechanical employees were in trucks used to transport goods or to transport material to be used in the production of goods shipped across State lines. With a single exception, these trucks had a rated load capacity of over one and one-half tons.

39. Defendant kept no record differentiating between the work performed by his employees on trucks used in interstate commerce and those used in intrastate commerce.

40. In addition to parts valued at $2,075.84 installed on used motor vehicles accepted in trade by defendant, the labor performed thereon increased their value by $1,704.40. This figure is included in the amount, shown on the chart under paragraph 20, supra, received for used trucks and the used passenger car. Such repairs and the installation of parts on the used motor vehicles were necessary to induce the public to buy them.

41. Defendant received on the average of once a week GMC and Divco truck parts and accessories. The former, which were the greater, came from the Parts Division of the General Motors Corporation in Philadelphia, Pennsylvania; the latter parts came from the manufacturer in the State of Michigan.

42. Parts and accessories were ordered by the parts salesman as the necessity arose to refill depleted stock. On receipt of the parts and accessories, the parts salesman checked and placed them on the proper shelves or in the proper bins in the parts department. These activities were and are a substantial and regularly recurring part of this employee's employment.

43. Some of the items carried in stock, mainly those of GMC, were obtained in anticipation of the needs of certain customers as determined by a contract, understanding or order.

44. The parts salesman handled the over the counter sales of parts and accessories to purchasers; he also delivered the parts to defendant's mechanical employees. A portion of the sales and deliveries were made for installation on trucks which transported goods across State lines, or transported material which aided in the production or sale of goods in commerce among the several States. However, here again, no records of sales on this basis was kept by the defendant.

45. The parts salesman assisted in the preparation of the new trucks for use. At the present time, he does not participate in this classification of work.

46. The defendant has not fully kept records nor made reports required of employers who employ persons covered by the Fair Labor Standards Act as provided for in section 11(c) of that Act, 29 U.S.C.A. § 211(c), and regulations of the Administrator of the Wage and Hour Division prescribed under authority of the Act, 29 U.S.C.A. Appendix—Rules and Regulations, Part 516, pp. 433 to 446.

47. It is a well-recognized concept in the automotive trade industry that sales of trucks in non-fleet quantities to persons for business or commercial use and not for resale purposes have always been regarded as retail; sales of trucks for resale or in fleet quantities are not considered retail.

48. The industry has never drawn any distinction between the sale of passenger cars and the sale of trucks with respect to the question of whether the transaction is retail or not. In both cases, the transaction is regarded as retail so long as the sale is to the ultimate purchaser in non-fleet quantities. No distinction is drawn from the fact that the truck is sold for business or commercial purposes while the passenger car is, in the main, sold for personal or family use. The same holds true for passenger car parts and truck parts.

### Conclusions of Law.

1. This court has jurisdiction of the parties and the subject matter of this action.

2. Within the meaning of the Fair Labor Standards Act:

(a) The trucks ordered from without the State of Pennsylvania and sold by the defendant remained in the channels of interstate commerce at least until they were delivered to the purchaser.

(b) The ordering and receipt of parts and accessories in the State of Pennsylvania from a manufacturer beyond that State for the purposes of resale in that State is engaging in interstate commerce.

(c) A substantial part of defendant's mechanical employees and parts salesman's activities related to goods which were in the channels of interstate commerce.

(d) The sales of trucks and freight trailers to individuals or concerns for commercial or business purposes and not for personal, family or household use, and the sales of parts for those vehicles are not retail. Roland Electrical Co. v. Walling, 1946, 326 U.S. 657, 671–678, 66 S.Ct. 413, 90 L.Ed. 383.

(e) Defendant's business place is not a retail or retail service establishment.

(f) Defendant's parts salesman is not employed in a bona fide local retailing capacity.

(g) Defendant has failed to pay his employees time and a half for overtime.

(h) Defendant has failed to maintain proper records and make required reports.

3. The plaintiff is entitled to a decree enjoining the defendant from engaging in interstate commerce unless and until he complies with the provisions of the Fair Labor Standards Act.

Accordingly, the plaintiff may prepare and submit a decree.