## BOGASH et al. v. BALTIMORE CIG-ARETTE SERVICE, Inc.
### No. 6325.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 8, 1951.

Decided Dec. 17, 1951.

Ellis Peregoff, Baltimore, Md. (Gilbert I. Friedel, Baltimore, Md., on brief), for appellants.

Bessie Margolin, Asst. Solicitor, Washington, D. C. (William S. Tyson, Solicitor, William A. Lowe, Washington, D. C., and Sylvia S. Ellison, Washington, D. C., and Ernest N. Votaw, Regional Atty., United States Department of Labor, Philadelphia, Pa., on brief), for the Secretary of Labor as amicus curiae.

Robert F. Skutch, Jr., and Leroy W. Preston, Baltimore, Md. (J. C. Merriman and Weinberg & Green, all of Baltimore, Md., on brief), for appellee.

Before SOPER and DOBIE, Circuit Judges, and MOORE, District Judge.

SOPER, Circuit Judge.

This suit was brought by Murray Bogash, Jack Frank and Jules Finkel to recover from the Baltimore Cigarette Service, Inc., a Maryland corporation, unpaid overtime compensation for the period between July, 1947 and July 5, 1950 and liquidated damages which they claimed to be due under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201, &c. The company defended on the ground, among others, that the business was a retail or service establishment, as defined in Section 13(a) (2) of the Act, and hence its employees were not covered by the wage and hour provisions contained in Sections 6 and 7 of the Act. The District Court accepted this view and dismissed the suit.

The company was engaged in the business of selling cigarettes at retail from automatic vending machines owned and placed by it in 700 to 800 localities in Baltimore City and elsewhere in the State of Maryland. The machines were placed in restaurants, taverns and retail stores under contract to pay the owners thereof an agreed consideration, usually based on a percentage of the sales. The company retained title to the machines.

The company purchased the machines and the cigarettes from manufacturers outside the state. It purchased matches furnished to buyers with the cigarettes within and outside the state. It maintained an office in a converted residence at No. 844 Park Avenue in Baltimore at which it had a stock room for supplies and a place to keep the machines pending delivery to the retail locations. Employees of the company secured locations and contracts for the installation of the machines, and route men brought the supplies from the office and warehouse to the machines and brought back the money to the central office.

The president of the company was Louis Bogash. His brother, Murray Bogash, one of the plaintiffs, was called sales manager. It was his duty to secure locations and negotiate contracts for the operation of the machines. Every third week he checked out the supplies to the route men[1] at the central office and warehouse. He received a salary of $70 per week, a generous expense account and the use of an automobile.

Jules Finkel, one of the plaintiffs, was a nephew of Louis Bogash, the president. His duties were to superintend the unloading of the vending machines at the warehouse, when received from outside the state, to deliver, install and repair machines at the retail locations, and to remove them when locations were discontinued. Occasionally he acted as substitute for and performed the duties of a route man. Periodically he checked out the supplies to route men at the central office and warehouse. His salary ranged from $75 to $90 per week.

Jack Frank, one of the plaintiffs, was the brother-in-law of Louis Bogash, the president. He was called the manager and was in charge when the president was absent. His duties were to check the delivery of vending machines and cigarettes into the warehouse. He filled the bins from which the route men drew their supplies and received the money, amounting to about $4500 per day, which the route men brought in from the machines. He also kept an inventory of the cigarettes. He received a salary of $80 per week.

During the period of their employment the plaintiffs made no request for and had no expectation of receiving pay for overtime service. They were closely connected

---

1. There were in all 13 employees, including the 3 plaintiffs, route men, repair men, a clerk and the president.

with the president by ties of blood or marriage and worked together harmoniously until his death on April 29, 1950. At this time they expected advancement or promotion from the Rowe Corporation, the parent New York Company, and when their hopes were not realized they left their employment on July 5, 1950 and participated in the establishment of a competing business. Litigation followed in which they were enjoined from prosecuting the new business on the ground that their actions violated restrictive agreements that they had made with the defendant company. Subsequently they instituted the pending suit.

It is conceded that the business of the company consists of selling cigarettes at retail, and hence it would seem that it is a "retail or service establishment" within the literal terms of Section 13(a) (2) of the Act, as amended, since 75 per cent. of the sales are not for resale and more than 50 per cent. of the sales are made within the State of Maryland. Indeed all of its sales are at retail and within the state. Nevertheless it is contended by the plaintiffs and by the Secretary of Labor, appearing as amicus curiae, that the central office and warehouse of the company are not part of a retail establishment, but constitute a wholesale establishment whose employees are covered by the Act in the same manner as the employees who operate the central warehouse of an interstate chain store system. It is said that all of the plaintiffs were engaged in wholesale operations since Murray Bogash procured retail outlets, Finkel handled and delivered the machines to the various outlets, and Frank handled the incoming out-of-state goods and supplied them to the route men at the warehouse; and since in addition Bogash and Finkel periodically performed like services at the warehouse.

There can be no doubt that the sales made by the defendant company are exclusively sales at retail in the strictest sense of the word. They answer the description of retail sales set out in Roland Electric Co. v. Walling, 326 U.S. 657, 666, 674, 66 S.Ct. 413, 90 L.Ed. 383, where it is said that the exemption contained in Section 13(a) (2) of the statute reaches employees of only such retail or service establishments as are comparable to the local merchant corner grocery or filling station operator who sells to ultimate consumers at the end of that flow of the goods in commerce which the Act is designed to reach; and that wholesaling includes marketing transactions in which the purchaser is actuated solely by a profit motive in making the purchase, while retailing includes all market transactions in which the purchaser is actuated solely by a desire to satisfy personal wants. It is contended, however, that the decision in the pending case is governed by the leading case of Phillips, Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095, and the cases which have followed it under a variety of circumstances.[2] In that case employees at a central warehouse, whence merchandise received for the most part from out of the state, was distributed as needed to a chain of 49 stores in two states, were held not to be covered by the retail exemption contained in Section 13(a) (2) of the Act. Such a warehouse was held to possess the status and to perform the functions of a conventional wholesaler of merchandise whereby the middle man was eliminated from the channel of distribution and an institution of a hybrid retail-wholesale character was created, whose wholesale functions performed at the warehouse were entirely distinct from its retail functions at the retail stores, so that the employees carrying on the former were subject to the general provisions of the Act while the employees carrying on the latter were covered by the excepting clause.

Similarly, it is said that the central office and warehouse of the defendant company in this case represents the wholesale feature of its business, while its retail sales are made at numerous outlets which cor-

2. See Fletcher v. Grinnell Bros., 6 Cir., 150 F.2d 337; Walling v. Goldblatt Bros., 7 Cir., 152 F.2d 475; Montgomery Ward & Co. v. Antis, 6 Cir., 158 F.2d 948; McComb v. W. E. Wright & Co., 6 Cir., 168 F.2d 40; McComb v. Wyandotte Furniture Co., 8 Cir., 169 F.2d 766; Armstrong Co. v. Walling, 1 Cir., 161 F.2d 515.

respond to the individual units of a retail chain store system. We do not think that the analogy is tenable. The individual automatic vending machines cannot be realistically likened to independent retail stores. They are rather silent and automatic salesmen offering at retail the goods of a single enterprise. They are well described in the following excerpt from Walling v. Sanders, 6 Cir., 136 F.2d 78, 81: " * * * The method by which such machines operate is generally known. They serve the retail customer directly without the intervention of those in whose establishments they are placed. To say that the retailer buys the cigarettes at wholesale and then sells them at retail through the instrumentality of the machine, is to completely ignore the realities. The store proprietor receives rental for the space occupied by the machine, in a percentage of its sales. He does not buy, handle, or acquire title to the cigarettes. He serves no customers and collects no purchase price. The machine is the mechanical arm of the operator who sells directly to the customer. Such sales may not otherwise be considered than as retail sales."

All of the work which the plaintiffs performed was designed to promote and effectuate the retail sale of merchandise to individual customers. It is true that the company also maintained a central office and warehouse for the storage of merchandise to be sold and for the safe keeping temporarily of the machines pending their placement; and that the plaintiffs also served this department of the business. But a store room is a customary and essential feature of every retail establishment of substantial size; since a supply of merchandise must be kept on hand until the needs of the enterprise require that it be displayed for sale; and it is well known that in the larger retail stores huge quantities of merchandise are regularly kept in separate locations until needed. There is substance in the ruling that chain store systems combine wholesale as well as retail elements into a single system which must be separated in order that the affirmative provisions as well as the exemptions of the statute may be given effect. But this pro-

cedure may not be carried so far by the courts as to divide a genuinely retail business into separate parts, so as to hold that the exemptions apply only to those employees who perform the act of selling. All employees employed by a retail establishment as defined in the statute are covered by the exemption. This situation was strikingly recognized and given effect in Walling v. Goldblatt Bros., 7 Cir., 152 F.2d 475, where an enterprise consisting of several department stores and warehouses was held to be covered by the doctrine of Phillips, Inc. v. Walling, supra, and yet it was held that the employees of one warehouse which serves only one of the retail stores were within the statutory exemption.

The judgment of the District Court is affirmed.