## BURHANS et al. v. MONTGOMERY WARD & CO., Inc.

United States District Court
S. D. New York.

Nov. 24, 1952.

Katz & Wolchok, New York City, for plaintiffs.

White & Case, New York City (John A. Barr, Charles J. Barnhill, William Niemann, Chicago, Ill. and Chester Bordeau, New York City, of counsel), for defendant.

LEIBELL, District Judge.

The plaintiffs, six former employees of defendant Montgomery-Ward, have brought this action under the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, to recover unpaid overtime compensation, liquidated damages, and attorneys' fees. While originally alleged to have been commenced by the six named plaintiffs for themselves and other employees similarly situated, later, by stipulation, the action was continued only on behalf of these six men.

Solely for the purposes of this litigation both parties waived a formal trial and submitted the controversy on a stipu-

lation of · facts. The stipulation includes the amount of overtime compensation to be awarded to each employee, if he is found to be entitled to a judgment herein. The amount of any liquidated damages and attorneys' fees would, of course, rest with the Court.

Plaintiffs allege that defendant, as owner of over 600 retail stores throughout the United States, several mail order houses and factories, and numerous warehouses, is engaged in interstate commerce; that defendant is an Illinois corporation and has a place of business at 75 Varick Street, New York City; that plaintiffs were employed by the defendant in an Albany warehouse at 1275 Broadway (the A. P. W. building) in that city; that the Albany warehouse has been occupied by defendant and various subsidiary and affiliated companies for the warehousing and storage of merchandise and for the manufacture, refinishing, rebuilding, repair and packing of furniture and for related clerical and office work; that substantial quantities of the merchandise in the building were purchased, received and unloaded at the building in interstate commerce and substantial quantities have been sold, shipped and distributed in various states outside the State of New York; that employees of defendant have worked in and about the building in various capacities which were closely, immediately and essentially related to the interstate aspects of defendant's business; that plaintiffs were so employed and worked over forty hours per week but were not paid overtime compensation as prescribed by the Act.

Defendant's answer admits employing the plaintiffs but denies many of the allegations of the complaint, and alleges that the warehouse was used solely as part of defendant's Albany retail store, for the storage of goods to be sold in said store and for the delivery of purchases to customers of said store. The extent of the denials need not be discussed because the parties later entered into a very detailed stipulation of facts, set forth in eighty-four paragraphs.

The answer and amended answer of the defendant plead three complete and two partial defenses. The *first complete defense* is that each plaintiff was engaged in the defendant's retail establishment at Albany, New York,[1] the greater part of whose selling was in intrastate commerce within the meaning of the Fair Labor Standards Act of .1938 and that the provisions of the Act do not apply to plaintiffs. § 13(a) (2) of the Act. The *second complete defense* is that each plaintiff's employment at defendant's Albany retail store, was in a · bona fide local retailing capacity, as delimited by the Administrator of the Wage and Hour Division of the United States Department of Labor, and that Section 7 of the Act, providing for overtime compensation, does not apply to plaintiffs because of the exemption set forth in Section 13(a) (1) ·of the Act. The *third complete defense* is that Section 7 of the Act applies only to employees engaged in interstate commerce or in the production of goods for such commerce, and that plaintiffs were not so engaged.

The *fourth defense* (pleaded as a partial defense) alleges that assuming that some or all of the plaintiffs are entitled to a recovery, parts of their claims, which accrued prior to December 18, 1939, are barred by the Statute of Limitations. This defense has been eliminated from the case by a stipulation of the unpaid overtime due each plaintiff, if he is covered by the Act.

The *fifth defense,* also a partial defense, relates to the claim for liquidated damages and alleges that defendant's failure to pay overtime compensation, if any, was in good faith, and that defendant had reasonable grounds for believing that such failure was not a violation of the Act, and that under Section 11 of the Portal to Portal Act of 1947, 29 U.S.C.A. § 260, the claim of the plaintiffs for liquidated damages in addition to any overtime compensation awarded, should be denied.

---

1. The retail store is located in Menands, New York, a suburb of Albany, but was referred to by the parties, and will be referred to in this opinion, as the Albany store.

These special defenses thus raise two main issues as to each plaintiff's claim: (1) Was the nature of plaintiff's employment such that the overtime provisions of the Act do not apply to plaintiff because of the exemptions set forth in § 13(a)(1) or § 13 (a)(2) of the Fair Labor Standards Act? (2) If plaintiff is covered by the Act, is he entitled to any liquidated damages under § 16(b) of the Act, as amended by § 11 of the Portal to Portal Act of 1947, and if so how much?

The stipulation of facts herein describes the employment of plaintiffs, that they were recorded as employees of defendant's Albany retail store; the hours for which they were actually paid overtime compensation during certain periods (pars. 1 to 3); the general business of the defendant (pars. 4 to 8); the factories of the defendant (pars. 9 and 10); the wholesale activities performed by defendant (pars. 11 to 22); the relation between the Albany retail store and the Albany mail order house (pars. 23 to 33); the method of receiving, storing and displaying merchandise of the Albany retail store (pars. 34 to 47); the organization, records, and accounts of the Albany retail store (pars. 42 to 57); the sales and operating procedure of the Albany retail store (pars. 58 to 64); the activities carried on in the A.P.W. building (pars. 65 to 71); the warehousing or stocking of merchandise for the Albany store (pars. 72 to 74); the furniture repair and refinishing activities of the Albany store (pars. 75 to 78); and the specific work performed by each of the individual plaintiffs (pars. 79 to 84). Many of these eighty-four paragraphs may be briefly summarized or are not of sufficient importance to require any quotation thereof; from others I have quoted the parts most pertinent to the issues, and in some instances the entire paragraph is quoted.

The defendant, Montgomery Ward & Co,. was an Illinois corporation, duly qualified to do business in all forty-eight states, and was engaged in the business of distributing general merchandise at retail through ten mail order houses and 632 retail stores. The central offices of the defendant were located in Chicago and New York City. The business of operating the mail order houses was conducted through a mail order division; and that of the retail stores through a retail division. The divisions were independent of each other and each division was supervised by a separate manager or Vice-President. One of the mail order houses was located at Albany, New York, and one of defendant's retail stores was also located in Albany. Defendant operated four factories; two in Illinois (paints and farm equipment); one in Maryland (closed August 31, 1942) and one in Iowa (wire fencing). The products manufactured or produced at the factories constituted approximately 2% of the total goods sold by defendant. Each factory operated as a separate, independent unit and had its own manager, who was under the general supervision of the General Manager of factories, at Chicago.

Defendant's wholesale activities were conducted through pool warehouses; one was in New York City, another in Chicago, a third in Baltimore and still others in other parts of the country.

The employees of defendant in its central offices in Chicago and New York City, the employees in its factories and the employees in its pool warehouses were paid wages and overtime in accordance with the provisions of the Fair Labor Standards Act.

Defendant's Albany retail store was opened in 1929 at 150 North Broadway, Menands, New York, a suburb of Albany. The Albany mail order house was also located in this building. Defendant owned the land and building. The mail order house was charged with all the taxes, insurance and structural maintenance. The retail store occupied a defined space in the building and was charged a monthly occupancy charge, in the nature of rent, for the space assigned to it. The amount of the charge was credited to the Albany mail order house on defendant's books. The retail store was located on the first four floors of the front wing of 150 North Broadway building and was kept within its own defined space. The mail order house

was operated independently of the retail store. No interchange of employees took place between the mail order house and the retail store at Albany. All employees of the mail order house were paid in accordance with the provisions of the Fair Labor Standards Act.

Paragraph (34) of the stipulation states:

"(34) On the first floor of the 150 North Broadway building, more than three-quarters of the space occupied by the retail store was used for the display of merchandise. The remaining portion of the retail store's first floor space was used for alteration, receiving and stock room, boiler room, elevators and stairways.

"More than eighty per cent (80%) of the second floor space occupied by the retail store was used for the display of merchandise. The remaining portion of the second floor was used for a display fixture room, stock rooms, stairways, and the customer and employee rest rooms.

"More than three-quarters of the third floor space occupied by the retail store was used for the display of merchandise. The remaining portion of the third floor was used for the store's general offices, credit offices, will-call room, stairways, and employees' check room.

"On the fourth floor space occupied by the retail store were the advertising office, a receiving room, a stock room, a marking room, a wrapping and packing room, carpenter shops, stairways, elevators, and rest rooms."

The equipment of the Albany store, the stock it carried and the general practices in conducting its operation were similar to those of other retail stores in Albany and elsewhere.

The practices of the Albany retail store were:

"37. * * *

"(a) To deliver over the counter to customers from display stocks small items easily carried by the customer and which the customer wished to take with him;

"(b) To keep on display several of the identical items when no additional floor space would be required to do so;

"(c) To maintain in immediately adjacent storerooms reserve stocks or advance reserve stocks of merchandise customarily deliverable over the counter;

"(d) To maintain further reserve stocks of merchandise customarily deliverable over the counter in storerooms located as close as possible to the space where the merchandise is displayed;

"(e) To display single samples of heavy or bulky merchandise and to make deliveries to the customer of identical articles taken from reserve stocks;

"(f) To maintain reserve stocks of heavy or bulky merchandise not customarily deliverable over the counter in warehouse space adjacent to the points used for the purpose of delivery to customers;

"(g) To provide a delivery service to the homes of customers living in Albany or in adjacent areas within the normal retail trade area of Albany;

"(h) To make alterations in garments and other merchandise sold to customers;

"(i) To assemble for the customer merchandise received in a knocked-down or unassembled condition;

"(j) To install mechanical merchandise in the homes of customers;

"(k) To repair and service merchandise previously sold to customers;

"(l) To inspect and to prepare for customer approval merchandise to be delivered to the customer."

The business of the Albany retail store expanded, and by May 1, 1938, additional space was needed. No more space was available to the retail store in the 150

North Broadway building or in any adjacent building.

To meet this situation the defendant in 1938 leased a warehouse in the nearby City of Troy, solely for the Albany retail store, for the storage of heavy and bulky merchandise. The Troy building proved to be inadequate and a further change was made in January 1941 to secure more satisfactory warehouse space for the Albany retail store. No more space was available to the retail store at that time in the 150 North Broadway building or in any adjacent building. Thereupon:

"(42) The defendant, on January 1, 1941, leased substantially all of the first or ground floor of a building located at 1275 Broadway, Albany, New York, approximately one mile from the 150 North Broadway building. (The space leased in this building will be hereinafter referred to as the 'A.P.W. building.') This building was owned by William K. Sanford and Carroll Kiernan. The amount of the rent for this building was charged to the Albany retail store in the same manner as the occupancy charge for the store's space in the 150 North Broadway building. All of the functions performed in this building had, prior to May 1, 1938, been performed in the 150 North Broadway building in the space allocated to the Albany retail store. The A.P.W. building was used exclusively by the retail store. The A.P.W. building was located on a railroad siding and had platforms available for the loading and unloading of motor trucks."

The space in the A.P.W. building would not have been leased had the same amount of space been available in the 150 North Broadway building or in a contiguous building.

The A.P.W. building was used (a) for the storage of heavy, bulky and space consuming articles; (b) for the handling of all delivery activities of the Albany retail store; and (c) for the repairing and refinishing of furniture prior to sale or delivery to the customer or returned by the customer for such repair or refinishing.

The manner in which A.P.W. building was used by the Albany retail store was as follows:

"(45) The merchandise comprising the lines which were stored in the A.P.W. building was generally shipped directly to that building. In some cases, however, the merchandise would be received at the 150 North Broadway building and would be moved to the A.P.W. building in a truck known as a shuttle truck. A large majority of the merchandise comprising the lines of which reserve stocks were carried at the 150 North Broadway building were shipped directly to the latter building. Shipments were received by rail, motor truck, and by mail. Both the 150 North Broadway building and the A.P.W. building had railroad sidings and platforms for unloading railroad cars and trucks.

"(46) The merchandise received and stored in both buildings was carried on the single inventory of the retail store and was identified by the same numbering system throughout. The office personnel of the retail store audited and maintained as one the receiving, shipping, and delivery records of all merchandise stored in both buildings. Orders for all goods received and stored in the A.P.W. buildings were initiated and approved by the Assistant Manager in charge of merchandising for the retail store. Invoices for such goods were approved and passed for payment by the stock records office of the retail store located in the 150 North Broadway building under the supervision of the Assistant Manager in charge of merchandising or under the supervision of the store's Chief Accountant, also located in the 150 North Broadway building. There was no segregation on the books and records of the retail store between the merchandise received and stored at the 150 North Broadway building and the merchandise received and stored at the A.P.W. building."

About 48% of the total dollar volume of the shipments received by the Albany re-

tail store (including those received at the 150 North Broadway building and those received at the A.P.W. building) were shipments from out of the State and about 52% from within the State. This percentage relationship was about the same for merchandise received at each building separately. The total shipments received in the years 1939 to 1945 inclusive, ranged between five million and eight million dollars.

A description of the organization, records and accounts of the Albany retail store is as follows:

"(48) The Manager of the Albany retail store was responsible for every phase of the operation of the store, including both the 150 North Broadway building and the A.P.W. building. He was assisted by an Assistant Manager in charge of merchandising and by an Assistant Manager in charge of operating. The Albany retail store:

"(a) Sold merchandise primarily through sales clerks located in the retail store;

"(b) Made sales over the counter of all types of merchandise of a size and weight deliverable in this manner;

"(c) Sold merchandise to numerous customers in quantities similar to those in which sales were made of similar items by other retail stores in Albany and elsewhere;

"(d) Maintained uniform prices;

"(e) Did not customarily sell merchandise in large quantities at special quantity discounts;

"(f) Was patronized regularly by the general consuming public;

"(g) Made sales primarily to the general consuming public;

"(h) Did not solicit sales to wholesalers, jobbers, or to other retailers;

"(i) Provided for the delivery of merchandise to the homes of customers upon request;

"(j) Assembled knocked-down merchandise preparatory to delivery to customers;

"(k) Inspected merchandise, eliminated minor defects, or repaired minor damage prior to delivery of the merchandise to customers;

"(l) Made minor alterations in merchandise to suit individual requirements;

"(m) Made minor repairs in merchandise previously delivered to customers, either on company premises or in the homes of customers;

"(n) Provided service parts and serviced mechanical merchandise sold to customers.

"The services enumerated above were all customarily performed by other retail stores in Albany and elsewhere selling the same types of merchandise.

"(49) In addition to the Manager and the Assistant Managers, the store personnel including both the 150 North Broadway Building and the A.P.W. building consisted of an average of 154 sales clerks, 70 office employees, 49 stock handling employees, and 16 employees engaged in the preparation, service and repair to customer merchandise.

The employees of both the store and the warehouse are represented by a single Local Union as a bargaining unit, under a decision of the New York State Labor Relations Board:

"50. * * * There has never been any segregation in this bargaining unit, nor any distinction in the terms and conditions of employment, as between the employees whose work was at the 150 North Broadway building and those whose work was the A.P.W. building."

On all company records, the Albany retail store, including both the 150 North Broadway building and the A.P.W. building, was treated as a unit. In the monthly sales and profit and loss statement, the monthly report of retail store inventory, the retail merchandise statistics report and the retail inventory variance report, all pertaining only to the Albany re-

tail store, there was no segregation between the inventory or operations of the 150 North Broadway building and the A. P.W. building. All records for both buildings were kept at the 150 North Broadway building. The finances of the Albany retail store was handled as follows:

"(57) The defendant maintained a bank account in Albany, designated as the 'retail store operating account.'

"All disbursements for the entire Albany retail store including both the 150 North Broadway building and the A.P.W. building were made from the funds carried in the retail store operating account or from funds accumulated within the store from cash receipts of the store. The mail order house could neither deposit in nor draw upon the retail store operating account. No separate bank accounts were carried with respect to any department or division within the Albany retail store.

"If the retail store operating account was at any time insufficient to meet the demands for retail store disbursements, funds were transferred to that account upon request by the treasurer's office in Chicago, Illinois. With minor exceptions, store merchandise was paid for centrally through the Central Retail Accounts Payable Department in Chicago, Illinois, a branch of the comptroller's division. All of the payroll of the entire Albany retail store was paid from local funds whether from the retail store operating account or from funds accumulated within the store from cash receipts of the store."

All of the lines of merchandise carried in stock in the A.P.W. building were represented by samples on display in the 150 North Broadway building. Substantially all the reserve stocks of merchandise of a type deliverable over the counter were stored in the 150 North Broadway building.

As to any large or bulky item of merchandise, of a type not customarily delivered over the counter, and of which the particular customer desired to take delivery upon defendant's premises, delivery was made at the 150 North Broadway building if the item was from stock carried in that building, or from the A.P.W. building if the item was stored in that building.

The delivery activities at the A.P.W. building are described in the stipulation of facts, as follows:

"(65) Prior to January 1, 1941, all delivery activities were performed in the 150 North Broadway Building. Since that date, with very rare exceptions, all merchandise purchased by customers of the Albany retail store and delivered by the defendant to the homes of these customers was delivered from the A.P.W. building, whether or not the merchandise was selected from stock carried at the 150 North Broadway building or from stocks carried at the A.P.W. building.

"(66) If the article to be delivered to the customer's home was selected from stock carried at the 150 North Broadway building, it was transported from there to the A.P.W. building in a truck (spoken of as a 'shuttle truck'). At the A.P.W. building, it was unloaded from the shuttle truck and placed in a delivery bin. From the delivery bin the article was placed in a delivery truck and delivered to the customer's home in the same manner as merchandise which was originally stocked at the A.P.W. building.

"(67) If the article to be delivered was selected from stock carried at the A.P.W. building, it was moved from the storage bin to the delivery bin, or in the case of furniture, to the refinishing room, from which it was placed on a truck and delivered to the customer's home."

This was the practice generally followed by similar retail stores in Albany. Of the twenty-eight stores in Albany handling this type of merchandise in substantial volume, eleven maintained their delivery activities in a separate building.

The purchase price of merchandise sold by the Albany retail store (including merchandise stock in either building) was paid to defendant in this State. More than 99% of such merchandise was delivered to customers in this State and less than 1% outside this State. About the same percentage applied to merchandise delivered out of each building. Deliveries direct to customers accounted for about 90% of all merchandise removed from the A.P.W. building; and transfers of floor samples to the 150 North Broadway building accounted for the remaining 10%:

"(73) In the A.P.W. building, the defendant stored and handled only the merchandise of its Albany retail store. The defendant's employees at the A.P.W. building did not handle or work on any merchandise stored for the use of or sold by the defendant's mail order house, or any merchandise stored for the use of or sold by any of defendant's retail stores other than the Albany store.

"(74) None of the merchandise which was received and stored in the A.P.W. building was purchased for re-sale to any specific customer or identifiable group of customers nor was it carried in stock to meet the specific orders of any specific customer or identifiable group of customers. All the merchandise received or handled in the A.P.W. building was carried in stock to meet the anticipated demands of all future customers of the retail store."

Concerning furniture repair and refinishing activities of the Albany retail store, the stipulation of facts states:

"(75) The defendant's Albany retail store maintained a service department in the 150 North Broadway building engaged in assembling from a knocked-down condition, and repairing articles of merchandise, chiefly furniture, to be used as samples on the sales floor, and in assembling from a knocked-down condition, repairing, and servicing merchandise, including furniture, which previously had been sold to customers. Prior to March, 1941, these functions were entirely performed on the fourth floor of the 150 North Broadway building. In March, 1941, the work of furniture assembling, repair and refinishing was moved to the A.P.W. building.

"(76) The employees engaged in furniture repair and refinishing repaired furniture which was received at the A.P.W. building in a damaged condition after the merchandise was entered on the store's inventory, refinished furniture which had been sold, before it was delivered to customers, and repaired furniture which had been sold to, and was already in the hands of customers. For the last named purpose customers either returned their furniture to the A.P.W. building for repair, or employees called at the homes of customers and made the repairs in the customers' homes.

"(77) All furniture or service repair work performed for customers in the A.P.W. building was done pursuant to complaints or orders received from customers by the service department (prior to October 1, 1945) or by the adjustment department (after October 1, 1945), both located in the 150 North Broadway building."

This was in line with the practice in other Albany retail department stores, which sell furniture and mechanical merchandise.

Finally the stipulation of facts sets forth the specific work performed by each of the plaintiffs:

"(79) *Harry L. Burhans*—Burhans was employed by defendant on February 15, 1939, as an upholsterer, repair man and furniture refinisher. Until March, 1941, he worked in the refinishing room on the fourth floor of the 150 North Broadway building and after that date when the refinishing room was moved to the A.P.W. building he worked in the latter location. His duties consisted of making the necessary repairs on any furniture received in a damaged condition and

touching up and polishing furniture prior to its delivery to the retail customers. He also touched up and polished floor samples of furniture which were on display in the 150 North Broadway building. Approximately one-sixth of his time was spent in repairing at the customers' homes furniture damaged during delivery or damaged by the customer in his home. The overtime compensation to which plaintiff Burhans would be entitled if he should be held entitled to recover in this action amounts to $1,882.72.

"(80) *Norman Terwelp*—Terwelp was employed on March 27, 1941, as a crater. His work was performed in the A.P.W. building where he crated merchandise for delivery to customers and for the small number of shipments of goods to be returned to vendors. Much of the merchandise stored in the A.P.W. building was placed in the storage bins in a crated or packed condition. When such merchandise was sold, it was uncrated or unpacked by Terwelp for inspection and delivery to the retail customer. After April 13, 1945, Terwelp also spent a portion of his time each week picking merchandise out of stock to fill customer's orders and carrying it to the loading platforms for delivery to customers. The overtime compensation to which plaintiff Terwelp would be entitled if he should be held entitled to recover in this action amounts to $1,507.43.

"(81) *Joe Voleck*—Voleck was employed March 25, 1935. He worked in the 150 North Broadway building prior to the opening of the A.P.W. building as an order filler, drawing merchandise from stock for delivery to customers, segregating it, tagging it and taking it to the finishing department where it might be prepared for delivery. After March 7, 1941, he was assigned to work in the A.P.W. building in the same capacity. In this building he was given the additional duty of placing furniture in stock which was received from vendors.

From August 27, 1942 to October 8, 1945, he was not an employee of the defendant. On the latter date he was reemployed in the same capacity again working in the A.P.W. building. He also assisted in bringing merchandise from stock to the loading platform so that it might be delivered to customers. The overtime compensation to which plaintiff Voleck would be entitled if he should be held entitled to recover in this action amounts to $411.56.

"(82) *Anthony Malinowski*—Malinowski was employed by the defendant on April 3, 1945, as an order filler working in the A.P.W. building. This work required him to fill customers' orders for furniture by taking it from stock to the finishing room or to the delivery route bins so the merchandise could be prepared for retail delivery. He also assisted in unloading incoming merchandise and placing it in stock. On September 21, 1945, he was made receiving clerk with the responsibility of recording the receipt of all merchandise in the receiving record, checking the shipments received against orders and marking the merchandise with a tag or crayon. He also inspected merchandise for damage. The overtime compensation to which plaintiff Malinowski would be entitled if he should be held entitled to recover in this action amounts to $195.40.

"(83) *Hercules Rivenberg*—Rivenberg was employed November 16, 1943, as a stockman. His work was performed on the fourth floor of the 150 North Broadway building. It was his duty to place merchandise in the stock bins, to fill orders for floor stocks and to take this merchandise to the sales floor. He was released from the payroll December 18, 1943, and was rehired January 3, 1944, as a stockman. His work when he was rehired was performed in the A.P.W. building. His duties were to place merchandise in stock and to fill customers' orders. On September 7, 1944, he was transferred to the job of furniture polisher

which work was performed in the A.P.W. building, polishing furniture after it was sold but before delivery to the retail customer. In this capacity he did not handle or work on merchandise until after it was received and placed in stock. He worked only on preparing for delivery merchandise after it had been sold and removed from stock, and in polishing and touching up floor samples of furniture on display in the 150 North Broadway building. From September 5, 1945 to September 20, 1945, he worked in the 150 North Broadway building painting counters and fixtures. After September 20, 1945, he worked again in the A.P.W. building as a furniture refinisher and polisher handling merchandise which had been sold but before it was delivered to retail customers. The overtime compensation to which plaintiff Rivenberg would be entitled if he should be held entitled to recover in this action amounts to $669.71.

"(84) *Frank McLaren*—McLaren was employed April 28, 1933, and worked until November 21, 1941, as an order filler. This work was performed in the stock room on the fourth floor of the 150 North Broadway building. In this capacity he withdrew merchandise which had been purchased by customers from stock, packed it in the assembly room and classified it for delivery to the customer. He was not employed by defendant from November 21, 1941 to August 16, 1945. On the latter date he was re-employed as a stockman and order filler and worked in this capacity in the A.P.W. building. In this capacity he placed merchandise in stock, withdrew it from stock, tagged it and brought it to the loading platforms for delivery to customers. The overtime compensation to which plaintiff McLaren would be entitled if he should be held entitled to recover in this action amounts to $75.87. * * *"

Because of Judge Samuel H. Kaufman's long illness, this case, which was originally assigned to him, was on stipulation of the parties assigned to me by Knox, C. J., on September 15, 1952, for consideration and disposition. After examining the record and briefs of counsel, I conferred with counsel on September 24th and requested some additional facts on the services performed by Burhans (par. 79), Terwelp (par. 80) and Malinowski (par. 82). On November 7th the attorneys entered into a supplemental stipulation in relation to the work of those three employees. The supplemental stipulation reads as follows:

## "A.

"With respect to paragraph 79 of the Stipulation of Agreed Facts heretofore submitted to the Court, wherein it is stated in part 'His [Burhan's] duties consisted of making the necessary repairs on any furniture received in a damaged condition and touching up and polishing furniture prior to its delivery to the retail customer.', the receipt of furniture for repairs, touching up and polishing, would be furniture taken out of stock from the warehouse or from the store and in many cases furniture immediately received from outside vendors. The furniture taken either from the warehouse or store had at some time or other been received from outside vendors.

"The repair of furniture received in a damaged condition generally is repairing merchandise damaged by the carrier during the shipment and such repairs will be made within a reasonable time after the furniture has been received. The carrier is generally notified of the damage and generally instructions are received from the carrier for the performing of the repair on the furniture. Sometimes the carrier will send an employee to look at the furniture, apparently for the purpose of assessing the damage. Sometimes the carrier itself will make the repair on the furniture and on other occasions employees of defendant will make such repairs.

"The touching up and polishing of furniture is done immediately prior to

the delivery of the merchandise to the customer of defendant, after it has already been placed in stock.

## "B.

"With respect to paragraph 80 of the Stipulation of Agreed Facts heretofore submitted to the Court, in which is included the statement 'His [Terwelp's] work was performed in the APW building where he crated merchandise for delivery to customers and for the small number of shipments of goods to be returned to vendors', approximately 2% of the employee's time was devoted to the crating of merchandise 'for the small number of shipments of goods to be returned to vendors'.

## "C.

"With respect to paragraph 82 of the Stipulation of Agreed Facts heretofore submitted to the Court in which is included the statements 'He [Malinowski] also assisted in unloading incoming merchandise and placing it in stock' and 'On September 21, 1945 he was made Receiving Clerk with the responsibility of recording the reccipt of all merchandise in the receiving record, checking the shipments received against orders and marking the merchandise with a tag or crayon', the unloading of such merchandise would be either from the over-the-highway trucks or railroad freight cars. In both cases the unloading would be done at defendant's APW warehouse at 1275 Broadway. The checking of the merchandise is generally done in the warehouse after the shipments have been unloaded from the truck or freight car. In some cases, depending on the nature of the merchandise, the actual checking is done as the merchandise is removed either from the truck or freight car."

The defendant contends that the plaintiffs are not covered by the provisions of the Fair Labor Standards Act, because they are exempt therefrom under § 13(a)(1) and § 13(a)(2) of the Act. The period covered by this suit is 1939 to 1945. The provisions of those subdivisions of Section 13, T. 29 U.S.C.A. § 213, during that period read as follows:

§ 213. "(a) The provisions of sections 206 and 207 of this title shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator); or (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate com-commerce; * * *."

I shall first discuss the applicability of § 13(a)(2) of the Act to the claims of the plaintiffs.

Plaintiffs rely on A. H. Phillips Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 808, 89 L.Ed. 1095. In that case the Supreme Court held that the exemption of § 13(a)(2) of the Fair Labor Standards Act did not apply to employees in a wholesale warehouse, owned by a chain store company, which operated 49 retail grocery stores, 40 of which were in Massachusetts and 9 in Connecticut. The warehouse was the only one maintained by the Phillips Company and it serviced all 49 stores. The opinion states—"Each week a regular order is delivered to each store from the warehouse and additional deliveries are made as required. Merchandise is supplied on the basis of requisitions prepared by individual store managers, subject to revision by one of the three superintendents in the central office. All of petitioner's sales are made exclusivly at the retail stores and no deliveries to customers are made from the warehouse."

The work of the employees in the Phillips Co. central office and warehouse was described by the court as follows:

"Employees in the central office, which is located in the same building as the warehouse, perform the usual functions of checking invoices, paying bills, making out payrolls, keeping inventory records, checking store deliveries and the like. The various em-

ployees in the warehouse and the truck drivers handle the physical work connected with the receipt, storage and shipment of merchandise. None of these employees segregates his time as between interstate and intrastate shipments; both types of shipments are handled indiscriminately to and from the warehouse."

The Court then stated—

"Section 13(a)(2) by its very terms exempts only those employees engaged in a retail or service establishment operating primarily in local commerce. Petitioner claims that its retail stores, warehouse and central office together constitute a 'retail establishment' within the meaning of this exemption. The lack of merit in this claim is obvious. Even if, as petitioner urges, the word 'establishment' referred to an entire business or enterprise, the combined retail-wholesale nature of petitioner's interstate business would prevent it from properly being classified as a local 'retail establishment,' * * * as it is normally used in business and in government—as meaning a distinct physical place of business—petitioner's enterprise is composed of 49 retail establishments and a single wholesale establishment. Since the employees in question work in the wholesale establishment, Section 13(a)(2) is plainly irrelevant.

"Moreover, it is quite apparent from the sparse legislative history of Section 13(a)(2) that Congress did not intend to exempt as a 'retail establishment' the warehouse and central office of an interstate chain store system. From the standpoint of its legislative ancestry, Section 13(a)(2) is the offspring of a manifest desire to exclude from the scope of the Act 'business in the several States that is of a purely local nature.' Sen. Rep. 884, 75th Cong., 1st Sess., p. 5. Congress was interested in exempting those regularly engaged in local retailing activities and those employed by small local retail establishments, epitomized by the corner grocery, the drug store and the department store. It felt that retail concerns of this nature do not sufficiently influence the stream of interstate commerce to warrant imposing the wage and hour requirements on them. Ibid. p. 5. Section 13(a)(2) is a part of the Act only because of the fear that Section 13(a)(1), in exempting employees regularly engaged in a 'local retailing capacity,' did not clearly exclude those employed by local retailers who are situated near state lines and who make occasional interstate sales. Walling v. Jacksonville Paper Co., 317 U.S. 564, 571, 63 S.Ct. 332, 336, 87 L.Ed. 460."

The warehouse in the case at bar does not in any important particular fit the description of the warehouse in the Phillips Co. case. Further, the work performed by the employees in the Phillips Co. warehouse was not the same as that performed by the plaintiffs in the case at bar.

The term "establishment" as used in § 13(a)(2) has been defined by the Supreme Court as meaning "a distinct physical place of business" and the Court in the Phillips case held that Phillips' business enterprise was "composed of 49 retail establishments and a single wholesale establishment", and that the exemption of § 13(a)(2) of the Act did not apply to the employees who worked in the wholesale establishment. In Roland Electrical Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383, the Supreme Court discussed the main overall purposes of the Fair Labor Standards Act and the origin, purpose and scope of the exemption expressed in § 13 (a)(2).

A retail establishment is a business making retail sales, sales to the ultimate consumers. "The test of whether the local merchant or purveyor of service is operating a retail establishment is the type of customers he has; the volume of his business, the number of his employees or the manner in which trade is attracted and customers obtained is not material. If the customers are 'ultimate consumers' of the goods sold or serviced locally, the establishment is retail." Lesser v. Sertner's Inc., 2 Cir., 166 F.2d 471, at page 473.

In the case at bar the warehouse (the APW building) was used exclusively by the Albany retail store. The retail store was primarily engaged in intrastate commerce. The warehouse was not physically connected with the Albany retail store, but was a mile away; however, that is not determinative of the issue. In every other way it was part and parcel of the Albany retail store. It is the use made of the warehouse, not its location, that is important. A large retail store requires adequate space to store its stock. This it may do in the same building in which the store displays its merchandise for sale if suitable space is available; or it may store part of its stock in some local building whose location ·may depend on many collateral considerations. ·But if the function of the warehouse is solely to supplement and complete the functions of the retail store, and if the warehouse is in effect operated as a part of the retail store although not physically connected with it, the warehouse would, in my opinion, be part of. the "retail establishment". Those employees who are engaged in performing their duties in the warehouse under those circumstances are employees engaged in a "retail establishment" and are exempt from coverage of the Fair Labor Standards Act under § 13(a)(2) of the Act. This reasoning and conclusion is supported by the opinion of Judge Soper in Bogash v. Baltimore Cigarette Service, 193 F.2d 291, at page 294:

"But a store room is a customary and essential feature of every retail establishment of substantial size; since a supply of merchandise must be kept on hand until the needs of the enterprise require that it be displayed for sale; and it is well known that in the larger retail stores huge quantities of merchandise are regularly kept in separate locations until needed."

In Walling v. Goldblatt Bros., 7 Cir., 152 F.2d 475 (cited by Judge Soper) the State street warehouse of the defendant was not used by any of the stores except the State Street store, and it was connected by three passageways with the State Street store. The court held that the employees working in the State Street warehouse were employees of a retail establishment. Judge Soper did not consider a physical connection between the warehouse and the retail store essential to an application of the exemption provisions of § 13(a)(2) of the Act. A similar ruling had been made in Duncan v. Montgomery Ward & Co., D.C., 42 F.Supp. 879. Any other interpretation would result in conferring on a large retail store, that was so fortunate as to have an adjacent building as its warehouse, an unfair economic advantage over a large retail store that had its warehouse a mile away from the store itself. Interpretations of the statute that would result in any such discrimination are to be avoided.

The original Interpretative Bulletin issued by the Administrator in 1938 used the term "retail establishment" as meaning the same thing as a retail enterprise or business. The revised Bulletin (Interpretative Bulletin No. 6, June 16, 1941) in applying the term retail establishment to a multi-unit company, held that it would not mean that the entire business was a single retail establishment. Section 36 of the revised Bulletin stated that if there was unity of ownership of all departments in the store and if they were all operated as a single store, the enterprise taken as a whole would be considered an "establishment" within the meaning of Section 13(a)(2). That bulletin also held that warehouses, performing "wholesale functions", were not included in the exemption. Finally, Interpretative Bulletin, 15 F.R. 7245 (issued after the amendment of § 13(a)(2) in October 1949) specifically held that employees of an exempt retail or service establishment working in a warehouse operated by and servicing such establishment exclusively, are exempt as employees "employed by" the exempt establishment "regardless of whether or not the warehouse operation is conducted in the same building as the selling or servicing activities".

The amendment made to § 13(a)(2) in October 1949 used the words "employed by" instead of "engaged in", a retail or service establishment. This was the terminology of § 13(a)(1). The October 1949 amendment of § 13(a)(2) also sub-

stituted for the limiting clause "the greater part of whose selling or servicing is in intrastate commerce" as applied to the term retail establishment, a more detailed and comprehensive limitation of the term "retail establishment", in providing that "more than 50 per centum of which establishment's annual dollar volume of sales of goods or services" be "made within the State in which the establishment is located". The amendment also stated certain further conditions, that are not pertinent to the issues in this case.

For the reasons hereinabove stated, I have concluded that all the plaintiffs are exempt under § 13(a)(2) of the Fair Labor Standards Act from the wage and hour provisions of the Act, §§ 6 and 7. That ruling is sufficient to dispose of this case. But I shall also consider the applicability of § 13(a)(1) of the Act to the kind of work performed by the plaintiffs, whether a plaintiff was employed "in a local retailing capacity" or was performing a "wholesale" function, because that point has also been covered by the briefs of counsel, on the assumption that if the court found that the plaintiffs were not exempt under § 13(a)(2) of the Act, some of them might be exempt under § 13(a)(1) of the Act. Further, if an appellate court does not agree with my decision as to applicability of § 13(a)(2), it might then consider the applicability of § 13(a)(1) to the claims of the plaintiffs herein.

The claims of 81 employees of a central warehouse of Montgomery Ward servicing four local retail stores in the Detroit area came up for review in the Sixth Circuit. Montgomery Ward & Co. v. Antis, 158 F.2d 948, 949. The District Court, 63 F. Supp. 669, had held that every warehouse employee was engaged in interstate commerce and that the warehouse was not a retail or service establishment within the exemption set forth in § 13(a)(2) of the Act, and that none of the employees was engaged in a local retailing capacity within the exemption of § 13(a)(1). The appellate court described the work of the employees as follows:

"They worked in many job classifications falling into three categories. The first included employees engaged in receiving, unloading, assembling and handling merchandise as it was received at the warehouse, most of it from outstate shippers, in the clerical work incidental thereto, and in factory, engineering and warehouse service for the warehouse building. The judgment awarding compensation to employees in this category has been satisfied and no issue in respect to such employees is raised by the appeal. The controversy is in respect to the status of 36 employees who, in the second category, were engaged in loading, checking and dispatching retail deliveries to customers, in receiving uncompleted retail deliveries and in the clerical work incidental thereto, and those in the third category, who were engaged in the repair and servicing of merchandise for the stores and their customers, and in handling the incidental clerical work. Employees engaged in transportation of goods from warehouse to stores are not here involved."

The court in the Antis case further stated:

"If, as the cases exemplified by the Phillips decision hold, the wholesale activity of a chain store organization is within the stream of commerce until outstate merchandise is delivered to retail stores, it would seem to be implicit, in such rationalization, that interstate transportation terminates when the goods are placed on sale in a retail establishment and sold to customers thereof. No case holds otherwise.

"If this view is sound, the employees of the appellant who were, during the period here involved, engaged in loading, checking and dispatching retail deliveries to customers, receiving back incompleted retail deliveries, handling the clerical work incidental thereto, and those engaged in the repair and servicing of merchandise for retail customers and in handling incidental clerical work, are engaged in a local retail activity. Employees in these categories are not within the coverage of the Fair Labor Standards Act.

"It is not clear, however, from the record or findings, that employees engaged in the repair, polishing or refurbishing of merchandise for delivery to customers or at the homes of customers after delivery, do not also repair and polish merchandise received in the warehouse from interstate shipments before it is offered for sale at retail. If employees there are who perform both functions, each for a substantial portion of time, the judgments in their favor will be sustained. The judgment as to others appealing must be reversed."

The decision of the Sixth Circuit in the Antis case held that employees at the defendant's Detroit central warehouse who were engaged in retail activities were under § 13(a) (1) of the Fair Labor Standards Act exempt from the coverage of the Act, even though those activities were conducted in a chain store warehouse serving retail stores as a wholesaler, provided that "the activities of its delivery, repair and service employees are confined solely to merchandise which" (1) "physically or by sample, has already reached the retail stores" and (2) "such services are rendered in respect to merchandise already sold to retail customers by the retail stores". The Sixth Circuit also held that those employees who were "engaged in loading, checking and dispatching retail deliveries to customers, receiving back incomplete retail deliveries, handling the clerical work incidental thereto, and those engaged in the repair and servicing of merchandise for retail customers and in handling incidental clerical work, are engaged in a local * * * activity". By implication the Sixth Circuit held that it was a conventional retail function to keep polished and repaired merchandise already delivered to the retail store and accepted by the store; but that prior to acceptance of the merchandise by the retail store and to its inclusion in the store's inventory it would be the conventional function of the wholesaler to polish and repair and replace imperfect parts of any merchandise which on delivery to the retail stock was found to be defective and not acceptable to the retail store.

The Sixth Circuit seems to have departed somewhat from the reasoning in the Antis case, when it later decided McComb v. W. E. Wright Co., 168 F.2d 40, 43. But in the McComb case the court appears to have limited its decision to a holding that a warehouse or yard that served multiple retail facilities of the owner was not a retail establishment within the exemption of § 13(a) (2) of the Act. Indeed the court in the McComb case states explicitly— "there is no need here to decide whether a retail store, stocking merchandise in excess of its own current demand, comes within the hybrid characterization of the Phillips case". The court went on to say that "The concept of wholesaling has, however, now been broadened in respect to the scope of the exemption, by applying it to all sales that are not essentially and inescapably retail", quoting Roland Electrical Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383. The court in the McComb case applied the Phillips decision to the defendant's (Wright & Co.'s) "business integration", considering defendant's business as a whole. The employees involved were those engaged in the Main Street warehouse and in the High Street and Exchange Street yards. They spent 25% of their time in unloading and stowing both interstate and intrastate shipments received at the warehouse. About 15% of the defendant's business was interstate, so that they spent 3.57% of their time unloading and stowing goods received in interstate commerce. The court held this was sufficient, "however, and unsatisfactory as percentage standards may be in this respect".

In my opinion the ruling in Skidmore v. John J. Casale, Inc., 2 Cir., 160 F.2d 527, 530, is more reasonable. There the test applied was "a substantial amount of all the work done by that employee". This is in accord with the Antis case, supra. I shall now analyze the nature of the work performed by the six plaintiffs in the case at bar.

*Rivenberg* was employed November 16, 1943 as a "stockman". He worked at 150

North Broadway, placing merchandise in the stock bins, to fill orders for floor stock, and to take this merchandise to the sales floor. In January 1944 he worked at the APW building. There his duties were to place merchandise in stock and to fill customer's orders. In September 1944 he was made a "furniture polisher" at the APW building, polishing furniture after it had been sold and before its delivery to the customer. He also polished and touched up floor samples at 150 North Broadway. All of this work was performed in a "local retailing capacity". It was not concerned with wholesaling. For two weeks in September 1945 Rivenberg also painted counters and fixtures in the 150 North Broadway building. The counters and fixtures were used in retailing. Rivenberg's work clearly came within the exemption of § 13(a) (1). He was employed in a "local retailing capacity".

*McLaren* was employed from April 28, 1933 to November 21, 1941, as an order filler. He performed his work in the 150 North Broadway building and all of his work was in relation to merchandise that had already been sold to customers. He was reemployed by defendant as a stockman and order filler in August 1945 and worked at the APW building. None of his work related to any wholesaling function. The work he performed was in a "local retailing capacity" and would bring him within the exemption of § 13(a) (1) of the Act.

*Volech* was employed March 25, 1935, at the 150 North Broadway building as an "order filler", a purely retail activity. After March 7, 1941 he worked at the APW building. His duties there included placing in stock furniture which had been received from vendors. That is something a retailer must do to display and dispose of his merchandise. Volech also assisted in bringing furniture from stock to the loading platform to be delivered to customers. He was employed in a "local retailing capacity" and he rendered no services associated with any wholesale functions. He comes within the exemption of § 13(a) (1) of the Act.

*Terwelp* was employed on March 27, 1941 as a crater. When he crated merchandise for delivery to customers he was performing a retailing service. The stipulation states that he also crated merchandise "for the small number of shipments of goods to be returned to vendors". Although a wholesaler might also do that, it was a retailing activity as well, something which every retailer has to do at times. Further, only about 2% of his time was thus employed. That would be about 10 minutes of an 8-hour day, or 1 hour out of a 48-hour week. It would not be a substantial amount of his working time. Terwelp comes within the exemption of § 13(a) (1) of the Act.

*Malinowski* was employed as "an order filler", on April 3, 1945, moving furniture which had already been sold to retail customers. He also assisted in unloading incoming merchandise from trucks or freight cars at the APW warehouse, a large part of which had been shipped from outside the state. That might be either a wholesaler's function or the work of one employed by a large retailer. On September 21, 1945, Malinowski was made receiving clerk and recorded the receipt of all merchandise in the receiving records, checking the merchandise received against orders. He marked the merchandise with a tag or crayon. The checking was generally done in the warehouse, although in some cases it was done as the merchandise was being removed from the truck or freight car. It was done to make correct records of shipments received, many of which were interstate. A retailer would have to do that and so would a wholesaler. Malinowski also inspected merchandise received to see if it was damaged. A retailer would do that. He comes within the exemption of § 13(a) (1).

*Burhans* was employed as "an upholsterer, repair man and furniture refinisher" on February 15, 1939. In so far as he made the necessary repairs on furniture received in the warehouse from interstate shipments in a damaged condition, he would be doing work ordinarily done by a wholesaler, carrier or vendor; but it was work

which a large retailer might do in his own storeroom or warehouse, rather than experience the delay of sending the merchandise back to the vendor. Burhans comes within the exemption of § 13(a) (1) of the Act.

An exemption in a case such as this means that the work of the employee, except for the provisions of the exemption, might be covered by the Act because his work concerned the movement of goods in interstate commerce. But if the work was done in a retailing capacity, the worker would be exempt under § 13(a) (1) of the Act. Of course, if a workman's services were rendered to both a retailing establishment and a manufacturing concern, located in the same building, the workman would not be exempt under either § 13(a) (1) or § 13(a) (2) of the Act. Grant v. Bergdorf & Goodman Co., 2 Cir., 172 F.2d 109. And the same would be true if his services were so divided that for part of the time he served the defendant performing wholesaling functions and for part of the time retailing functions in the course of a day's work. That they did not do. The defendant was not doing a wholesaler's business at the warehouse. Part of the local Albany store's business was done there, and that was a retailing business. The customers of the store were ultimate consumers. They did not buy to re-sell at a profit. The warehouse had no customers other than the customers of the store.

As stated several times in the course of this opinion the APW building was a warehouse of the defendant that services only the local Albany retail store, and in fact was part of that retail establishment although not physically attached to it. Hence, when merchandise reached the warehouse from a vendor or shipper, by overland truck or freight car, the warehouse was not a mere stopping point, and the entry of the merchandise therein only a temporary pause, in its journey to retail stores of the defendant. When the merchandise reached the APW warehouse it came into the possession of the Albany retail store and became part of its inventory. The interstate journey of the merchandise was ended. In that respect, an

important one, the factual situation in this case differs from a whole line of cases cited by plaintiffs' attorney, including Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095; and Roland Electrical Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383.

I have concluded accordingly that the six plaintiffs herein come within the exemption of § 13(a) (1) and § 13(a) (2) of the Fair Labor Standards Act and that they have no claim for overtime under § 7 of the Act.

The complaint is dismissed on the merits. Let a judgment be entered to that effect.