James D. HODGSON, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

ROBERT HALL CLOTHES, INC., a corporation, and Robert Hall Clothes Greenbank Road Corp., a Corporation, Defendants.

Civ. A. No. 3289.

United States District Court,
D. Delaware.

April 16, 1971.

On Defendant's Motion for Reargument
May 10, 1971.

Peter G. Nash, Sol. of Labor, Louis Weiner, Regional Sol., Marshall H. Harris, Deputy Regional Sol., U. S. Dept. of Labor, and F. L. Peter Stone, U. S. Atty., Wilmington, Del., for plaintiff.

David F. Anderson and Robert K. Payson, Wilmington, Del. and Martin D. Eile and Henry J. Silberberg, New York City, of counsel, for defendants.

## OPINION

STEEL, District Judge.

This case involves the application of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), which was added as an amendment to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. The Court has jurisdiction under 29 U.S.C. § 217 (1964).

The Equal Pay Act prohibits an employer from discriminating "within any establishment * * * between employees on the basis of sex by paying wages to employees * * * at a rate less than the rate at which he pays wages to employees of the opposite sex * * * for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to * * * (iv) a differential based on any other factor other than sex * *."[1]

Invoking the enforcement provisions of the Act,[2] the Secretary of Labor brought this action against defendants, Robert Hall Clothes, Inc. and Robert Hall Clothes Greenbank Corp., claiming that since June 13, 1964 they have discriminated against saleswomen on the basis of sex by paying them at rates less than those paid to salesmen for equal work. The Secretary sought an injunction against future violations and the withholding of back pay.[3]

At all relevant times, defendant Robert Hall Clothes, Inc. (Robert Hall) has been a Delaware corporation with its main office in New York and defendant Robert Hall Clothes Greenbank Corp. (Greenbank) has been a Delaware corporation having its place of business on Greenbank Road, Wilmington, Delaware. Greenbank is a wholly owned subsidiary of Robert Hall Clothes of

---

1. 29 U.S.C. § 206(d) (1964) The full provision reads:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establisment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

2. 29 U.S.C. § 217.

3. See 29 U.S.C. § 206(d) (3).

1268

Jamaica, Inc., which in turn is a wholly owned subsidiary of Robert Hall.

Greenbank first opened for business in September, 1962. It was and still is engaged in the operation of a retail clothing store which sells men's and boys' and ladies' and girls' clothing and apparel.

Robert Hall, as agent for Greenbank and other similar subsidiaries operating elsewhere, has exercised overall management, authority and control over Greenbank and has established for Greenbank overall policies relating to working conditions, working hours, rates of pay and other employment practices.

■ The business activities of the defendant corporations are related and are performed through unified operation and common control and for a common business purpose. They constitute an enterprise within the meaning of section 3(r) of the Fair Labor Standards Act. (29 U.S.C. § 203(r)).

The annual gross volume of sales of the enterprise is not less than $1 million. It purchases or receives goods for resale that move across state lines, amounting annually to $250,000 or more. The enterprise is engaged in commerce or in the production of goods for commerce within the meaning of section 3 (s) (1) of the Fair Labor Standards Act. (29 U.S.C. § 203(s) (1).

The men's and boys' department, and the ladies' and girls' department at Greenbank are contained in one building. All men's and boys' merchandise sold in the one-floor store is located in the men's and boys' department which is on one side of the store, and all ladies' and girls' merchandise sold in the store is located in the ladies' and girls' department which is on the other side of the store. The two departments are separated by a center aisle nine feet eight inches, running the length of the store from the front entrance to the cashier's desk. There are six ladies' dressing rooms located in the ladies' department and five men's dressing rooms located in the men's department.

There is a wrapping counter and a cashier booth at the rear of the store, and both cashiers and wrappers handle merchandise and service sales made by both salesmen and salesladies at this common counter. Similarly, there is a common stock room and receiving room where all merchandise for both ladies' and men's departments is received. There is the same approximate footage utilized for ladies' and girls' merchandise as for men's and boys' merchandise. The only customer entrance is the main entrance at the front of the store.

Sales personnel in the men's and boys' department (men's department) and sales personnel in the ladies' and girls' department (ladies' department) at the Greenbank store perform their activities under similar working conditions.

■ Neither the Equal Pay Act nor the decisions thereunder define "establishment" as used in the Act. The Administrator has interpreted the word to have the same meaning it has in § 213 (a) (2) and elsewhere in the Fair Labor Standards Act. 29 C.F.R. § 800.103. Section 213(a) (2) has been interpreted by the Secretary in 29 C.F.R. § 779.304, which states:

> The unit store ordinarily will constitute the establishment. * * * The mere fact that a store is departmentalized will not alter the rule.

■ The interpretation of the Administrator of an Act is entitled to great weight. United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Roland Electric Co. v. Walling, 326 U.S. 657, 676, 66 S.Ct. 413, 90 L.Ed. 383 (1946); and see Idaho Sheet Metal Works v. Wirtz, 383 U.S. 190, 205, 86 S. Ct. 737, 15 L.Ed.2d 694 (1966). This is particularly true when the Administrator's interpretation, as here, represents the earliest contemporaneous construction of the statute by the authority charged with enforcing it. *American Truckinug Ass'ns, supra,* p. 539, 60 S.Ct. p. 1061.

Furthermore, in Phillips v. Walling, 324 U.S. 490, 496, 65 S.Ct. 807, 89 L. Ed. 1095 (1945) the court stated:

Congress used the word "establishment" [in section 213(a) (2)] as it is normally used in business and government—as meaning a distinct physical place of business * * *.

When the above definitions are applied to the layout and operations of Greenbank, it is clear that both departments constitute a part of a single establishment within the meaning of 29 U.S.C. § 206(d) (1).

At the outset three substantive questions must be decided: 1) does the Act apply where the nature of the jobs makes it impractical for both sexes to work interchangeably; 2) are the rates of wages which Greenbank pays to saleswomen less than those paid to salesmen; and 3) do saleswomen and salesmen perform equal work. If these three questions are answered in the affirmative, a fourth question must be decided, namely, whether the wage differential is based upon any factors other than sex.

1) Application of the Act to jobs which reasonably require performance exclusively by one sex

The jobs performed by salesmen and salesladies, respectively, are not reasonably susceptible of performance by both sexes because of the nature of the jobs. One is a "male" job and the other a "female" job. Defendants have always had a policy of having only salesmen in the men's and boys' department because of the frequent necessity for physical contact between the salespersons and the customers which would embarrass both and would inhibit sales unless they were of the same sex. Often the salesperson is required to assist with opening zippers; to touch the body of a customer near private parts in connection with the measurements of the crotch, seat, waist, chest or inseam; to touch other areas of the body while assisting in the try-on of a garment, and to observe the customer in various stages of undress in connection with try-ons. The question arises whether the Equal Pay Act was intended to apply to jobs which require employment by one or the other of the sexes exclusively.

Defendants contend that in such circumstances the Act does not apply. They rely upon 29 C.F.R. § 800.114 which states in paragraph (b):

The legislative history of the Equal Pay Act expressly refers to the War Labor Board experience as furnishing a guide for testing "the relationship between jobs" and determining "equal work" and "equal skills" for purposes of a "practical" administration and application of the Act's "equal pay policy" (see, e. g., S.Rept. 176, 88th Cong. 1st sess., to accompany S. 1409; H.Rept. 309, 88th Cong. 1st sess., to accompany H.R. 6060).

Accordingly, defendants cite War Labor Board cases which they say by analogy support their position. In Shultz v. Wheaton Glass Co., 421 F.2d 259, 265 (3d Cir. 1969), cert. den. 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64, however, the court held that the use of the War Labor Board cases as guiding principles for interpreting the Equal Pay Act is not warranted.

Section 800.114 notes that wage classification systems which designate jobs as male jobs and other jobs as female jobs may contravene Title VII of the Civil Rights Act of 1964,

except in those certain instances where sex is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business or enterprise. (29 C.F.R. § 800.114(a))

■■ Defendants argue that the Administrator of the Equal Pay Act has thus recognized that a bona fide occupation qualification such as exists at bar was outside the contemplation of Congress when it enacted the Equal Pay Act. To interpret § 800.114 to mean that under no circumstances can a wage discrimination based on sex violate the Equal Pay Act unless it also violates the Civil Rights Act is not justified.

**1270**

The reference in § 800.114 to the Civil Rights Act is simply a caveat to employers that in certain circumstances violations of the Equal Pay Act may also impinge upon the Civil Rights Act. It is nothing more. Furthermore, the statement in § 800.114 that the Civil Rights Act does not reach situations where sex is a bona fide occupation qualification is at least questionable. 42 U.S.C. § 2000e–2(e) provides that it is not an unlawful employment practice for an employer to *hire and employ* employees on the basis of sex provided that sex is a bona fide occupational qualification. No such exception appears in § 2000e–2(h) which relates to *compensation* discriminations based on sex. Whether under the Civil Rights Act compensation discrimination can be justified upon the basis of sex for the reason that sex is a bona fide occupational qualification depends upon the interpretation of the Equal Pay Act.[4] That is the question which must be determined without reference to the hiring and compensation practices permissible under 42 U.S.C. § 2000e–2(e) and (h), respectively.

■ Section 800.114 [5] states that the Equal Pay Act was intended to cover both situations where male employees are replaced by females and where both sexes perform the same work concurrently and interchangeably. This interpretation of the Act by the Administrator is an affirmative declaration of practices violative of the Act. It cannot be read as limiting the coverage of the Act without disregarding the plain implications of the Equal Pay Act itself, as construed by the courts.

■ The wage rate discrimination at which the Equal Pay Act is aimed arises when substantially equal jobs are performed by male and female employees; the jobs need not be identical but only substantially equal. Shultz v. Wheaton Glass Co., *supra*, p. 265; Shultz v. American Can Co.-Dixie Products, 424 F.2d 356, 360–361 (8th Cir. 1970) and Hodgson v. Brookhaven General Hospital, 436 F.2d 719 (5th Cir. 1970). The test for ascertaining whether the jobs are substantially equal is that prescribed by the statute as judicially interpreted, viz., whether they involve substantially equal skill, effort and responsibility. If they do, wage discrimination based upon sex is prohibited unless the discrimination is based upon one of the exceptions stated in § 6(d) (1) of the Act.

■ When properly read, the cases of Wirtz v. Muskogee Jones Store Co., 293 F.Supp. 1034 (E.D.Okl.1968) or Shultz v. Kentucky Baptist Hospital, 62 CCH Lab.Cas. 44,117 (W.D.Ky.1969) do not hold, as defendants argue, that no violation of the Equal Pay Act can exist if the jobs performed by male employees cannot be reasonably performed by female employees, or vice versa. The act has no such meaning.

2) Pay Differential

Greenbank employs salesmen and salesladies who work regularly forty hours a week or more and salesmen and salesladies who perform their duties on a sporadic basis and work less than forty hours per week. The former are referred to as full-time and the latter as part-time employees. The full- and part-time sales employees in the men's department have always been exclusively male, and the full- and part-time sales employees in the ladies' department have always been exclusively female. When Greenbank opened in September 1962, it employed the following sales personnel: two full-time females, fifteen part-time females, four full-time males, and twelve part-time males. By January 1963, the

---

4. The last sentence in 42 U.S.C. § 2000e–2(h) (Civil Rights Act) reads:
   It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29. [Equal Pay Act]

5. 29 C.F.R. § 800.114(b).

number of full-time sales personnel was reduced to two: one man and one woman. It has since remained at that figure.

The number of part-time sales personnel was pared down gradually during 1962 and 1963. It has since varied between two and five part-time salesmen and two and five part-time saleswomen, depending on the season.

At all times from the passage of the Act, the starting salaries for full-time salesmen at Greenbank have ranged between 21% and 55% higher than starting salaries for full-time saleswomen. The starting wage rate for part-time salesmen has likewise varied between 3% and 35% higher than that paid part-time saleswomen. See following Table 1:

Table 1—Starting [6]

| | Full-Time (per week) | | | Part-Time (per hour) | | |
|---|---|---|---|---|---|---|
| | M | F | % by which M exceeds F | M | F | % by which M exceeds F |
| 9/5/62–8/30/64 | $65 | $42 | 55% | $1.42 | $1.05 | 35% |
| 8/31/64–9/2/65 | 67 | 46 | 46% | 1.47 | 1.15 | 28% |
| 9/3/65–1/31/67 | 67 | 50 | 34% | 1.47 | 1.25 | 18% |
| 2/1/67–4/13/70 | 67 | 50 | 34% | 1.47 | 1.25 | 18% |
| 4/13/70 | 75 | 62 | 21% | 1.55 | 1.50 | 3% |

After the commencement of their employment, progressive increases were given to both male and female personnel, part-time and full-time, at specified intervals. These increases reflected compensation differentials which favored salesmen over saleswomen, and ranged from 35% to 52% in the case of full-time personnel and between 16% and 34% for part-time personnel. See following Tables 2 and 3.[7]

Table 2—6 Months After Starting

| | Full Time (per week) | | | Part-Time (per hour) | | |
|---|---|---|---|---|---|---|
| | M | F | % by which M exceeds F | M | F | % by which M exceeds F |
| 9/5/62–8/30/64 | $67 | $44 | 52% | $1.47 | $1.10 | 34% |
| 8/31/64–9/2/65 | 70 | 48 | 46% | 1.52 | 1.20 | 27% |
| 9/3/65–1/31/67 | 70 | 52 | 35% | 1.52 | 1.30 | 17% |

Table 3—1 Year After Starting

| | Full-Time (per week) | | | Part-Time (per hour) | | |
|---|---|---|---|---|---|---|
| | M | F | % by which M exceeds F | M | F | % by which M exceeds F |
| 9/5/62–8/30/64 | $71 | $48 | 48% | $1.57 | $1.20 | 30% |
| 8/31/64–9/2/65 | 73 | 50 | 46% | 1.57 | 1.25 | 26% |
| 9/3/65–1/31/67 | 73 | 54 | 35% | 1.57 | 1.35 | 16% |

The progression schedules were eliminated effective February 1, 1967 and defendants began a program of periodic merit increases in sales personnel salary and wage rates based on the recommendation of the store manager. He would base his recommendation on the employee's performance, length of service, attitude, absenteeism, time since last increase and economic factors.

Incentive compensation was also paid salesmen and salesladies. This was

6. Figures in columns M and F are taken from Px 1, 2, 3, 4 and 26. The per cent figures arise from computation.

7. Figures in columns M and F are taken from Px 1, 2 and 3. The per cent figures arise from computation.

based upon various factors such as type, number of garments sold to a given customer at one time, price, age of garment, etc. The system in its ramifications was extremely complex (Plaintiff's exhibits 5–10). It was designed to move merchandise and increase profits. Since no incentive rate existed for all male garments and all female garments, a direct comparison of rates is not possible. Different items of merchandise carry different amounts of incentive compensation. In both the men's and ladies' departments, the sale of some low priced items of merchandise, if sold individually, will not earn the selling employee any incentive compensation; almost all of the merchandise in the store when sold in multiple units (double-header) or in combination with other items to the same customer yield incentive compensation. Additionally, the incentive earned upon the sale of merchandise from a prior season may change from season to season, depending upon the length of time an item remains in the store. The longer it remains in the store, the higher the incentive when it is sold.

The particular amount of incentive compensation placed upon a particular item of merchandise, regardless in which department it is sold, is determined not by whom the item is sold, but on the need to sell the particular item, the mark-up on the item, the profitability to the store on the sale of the item, the length of time the item is in the store, the ease of selling the item and its selling price.

In both men's and ladies' departments the higher the price of the merchandise the greater the incentive compensation. More high priced merchandise is carried in the men's department than in the ladies' department, i. e., 60% of the men's suits and coats are over $39.95, whereas 20% of ladies' coats and suits are over $39.95. The average unit selling price of merchandise is substantially higher in the men's department than in the ladies' department.

Merchandise in the men's department remains in the store longer before it is sold than merchandise in the ladies' department. Merchandise sold in the ladies' department is more related to change in fashion, and consequently, is frequently removed and salvaged if not sold in the current season. Rarely is merchandise in the ladies' department retained which is more than two six-month seasons old. On the other hand, it is common for men's merchandise to date back four or six six-month seasons. Thus, there is reasonably a greater category breakdown in the incentive compensation payable upon the sale of men's stale merchandise than there is for ladies' stale merchandise, i. e., in the case of men's stale merchandise, there are four different age categories of merchandise; whereas in the case of ladies' stale merchandise, there are only two different age categories of merchandise; the older the merchandise within a category, the higher the incentive.

The net effect of the incentive system, however, resulted in a ratio of incentive pay to gross sales which was approximately .2% more in the case of men than women.

▮ Under the Act the "wages" which must be paid at equal rates to both sexes if the work performed is equal include "all payments made to or on behalf of the employee as remuneration for employment." 29 C.F.R. § 800.110. The term wage "rate" used in the Act encompasses all rates of wages "whether calculated on a time, piece, job, incentive or other basis." 29 C.F.R. § 800.111. The Government has established by a preponderance of the evidence that Greenbank, subject to one exception,[8] has paid saleswomen "wages"—starting, progressive and incentive—at "rates" less than those paid to salesmen.

3) Equality of Jobs

Salesmen are engaged in selling men's and boys' apparel such as top coats, sport coats, suits, slacks, sweaters, shoes, un-

8. The record does not permit any finding to be made on the merit increases which were granted after February 1, 1967.

derwear, and furnishings, in sizes 2 through adult. Salesladies engaged in selling women's and girls' and infants' apparel, such as coats, dresses, suits, slacks, skirts, pants suits, sweaters, blouses, hosiery, and undergarments, in sizes 9 months through adult.

Obviously the jobs performed by salesmen and salesladies are not identical. Salesmen sell different merchandise from salesladies and the customers of salesmen are mostly men and boys whereas the customers of salesladies are mostly women and girls. These distinctions make the job different. They do not necessarily make the job unequal within the meaning of the Equal Pay Act. The Act does not require that the jobs performed be identical but only that they be substantially equal. Shultz v. Wheaton Glass Co., 421 F.2d 259 (3d Cir. 1970), cert. den. 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64. See 29 C.F.R. § 800.120. This does not depend upon job classification but rather on actual job requirements. The jobs as a whole must be viewed over the entire work cycle. Wirtz v. Rainbo Baking Co., 303 F.Supp. 1049, 1052 (E.D. Ky.1967). Whether by this test the jobs of salesmen and saleswomen require substantially equal skill, effort and responsibility is the question to be resolved.

Both male and female sales personnel engage in selling the above described merchandise by applying sales techniques, basic knowledge of garments sold, materials, wearability, location of items in the store, and quality of garments stocked; by showing apparel to customers, engaging them in discussion about the merchandise, advising and answering questions as to appearance and fit, size, color, fabrics, appropriateness and quality of merchandise, all for the purpose of effecting a sale.

In hiring both male and female personnel consideration was given to the appearance of applicants and their response to questions submitted to them. There was no educational requirement for sales personnel of either sex.

Both salesmen and saleswomen perform the same inventory and stock work and housekeeping duties. They each move garments from the stockroom to the sales floor and make sure that the merchandise already on the floor is grouped according to size. After customer try-ons, both salesmen and salesladies put the garments back on the racks in their proper places.

Defendants argue that the job of selling in the men's department differs substantially from that in the women's department because of differences in the character, price, profitability, markup and markdown in the merchandise sold. Defendants also argue the job content of salesmen and saleswomen differs with respect to the type of training received, the work required of men in completing the back of the cash alterations sales slips, their alteration and fitting responsibilities and the use of sizing charts and tape measures in connection with fittings.

Generally speaking, the prices, profitability and markups were higher in men's wear than in women's wear and the markdown differences were less in the case of men's wear than in women's wear. These variances, however, were not so great as to make any significant differences in the effort, skill and responsibility required between the salesmen and salesladies in performing their jobs.

The character of the merchandise sold by salesmen and saleswomen was likewise different in that the styles, colors and materials varied. Differences of this kind do not necessarily mean that the sale of one article requires a higher degree of skill, effort and responsibility than the sale of another, see 29 C.F.R. § 800.123, and in the instant case they did not. Although men's suits are manufactured in various models which give rise to fitting and sizing problems, just as varied styles existed among women's garments which resulted in comparable sizing and fitting complexities. The skill, effort and responsibility in know-

ing the styles, colors and materials were not greater in the case of men than they were for women.

For the most part differences in instructions given to male and female sales personnel were occasioned by the differences in the merchandise which they were to sell. The testimony of salesmen as to the training which they received was not consistent, and at best such training as they had appeared to be perfunctory and in some instances on a day by day, on the job basis. Such training differences as existed were a minor consideration when viewed against the substantial identity of the over-all skill, effort and responsibility required of salesmen and salesladies.

As to fitting skill, effort and responsibility, some salesmen used a card which specified suit models of various types (Ivy, Bankers, Portly, etc.,) and related these types to waist and chest measurements of customers. By using the card the salesmen were able to tell at a glance which model, from a fit standpoint, would be most appropriate for a customer. This was a simple operation. The saleswomen had no such aid. They were required visually and by experience to determine sizes and types of dresses which would be best suited from a style and fit standpoint for customers to wear for a particular purpose. The sizing card furnished salesmen reduced or at least minimized the skill required of them as against that demanded of saleswomen in size selection.

Because no alterations were made by the ladies' department, whereas alterations were made in the men's department, salesmen were required to use a tape measure in measuring customers but saleswomen were not. This was but a minor variance in duties and did not distinguish the salesmen's job in any appreciable way from that performed by the saleswomen.

Nor did the knowledge of alteration possibilities on men's clothing vary importantly from the knowledge of saleswomen of the same possibilities. Although no alterations were made in the women's department, the job of saleswomen made it necessary for them to advise their customers of the "at home" alteration potentials.

The major thrust of the defendants' argument that the jobs of both sexes were substantially unequal rests upon the asserted fact that the salesmen, unlike the saleswomen, had to mark men's clothing so that the tailor would know what work he should do. The job of marking men's clothing for alterations was especially important, defendants argue, because Greenbank made it a policy to guarantee the fit of all men's clothing for the life of the garment. Hence, Greenbank was obligated to make additional alterations whenever the customer decided that the garment fitted him poorly, even if this occurred long after the date of purchase.

The basic premise of defendants' argument, i. e., that salesmen as a group had the responsibility of marking clothes for alteration is not borne out by the evidence. It discloses that marking was not uniformly performed by all the salesmen and that such marking as was done by some was subject to important qualifications.

The basic policy of Greenbank since opening in September of 1962 has been for either the manager or assistant manager to be called by a salesman to perform marking whenever alterations were required. This policy existed at least until January 10, 1968, when defendants' answer to plaintiff's initial interrogatory 21 was filed. It stated that male sales personnel did not engage in marking.[9]

9. A letter dated August 18, 1965 from Jerome H. Rockman, Director of Industrial Relations, Robert Hall Clothes, Inc. to Louis Weiner, Regional Solicitor, described the duties of individual salesmen and stated that:

The salesman must go with the customer to the fitting section, comment and make suggestions to the fitter and the customer during the course of the fitting.

It is true that at times the basic policy to have the manager or assistant manager mark the clothes has been deviated from. Such deviations as there were involved for the most part only simple and sporadic marking. Four of ten salesmen employed at the Greenbank store testified they performed no marking at all. Of the remaining six, three stated that their marking was limited to pants length, sleeve length and waist. Three other salesmen testified that they did more than this and also marked coat size, collars or crotch, but only if the manager or assistant manager were not available. The marking of cuffs, sleeves and waists was simple. At least two of the employees (Blawn and Steinebach) who performed this work did so within a few days after their employment.

The ability or inability of salesmen to mark clothes for alterations and the fact that they may have done so were not considered by defendants in fixing the wage differentials favoring salesmen. Considering the totality of the functions which salesmen and salesladies performed and the responsibilities which they assumed, such marking of clothes for alteration exclusively by salesmen as existed did not distinguish the job performed by salesmen from that performed by saleswomen to any significant degree.

Defendants point out that salesmen fill in the back of cash alteration sales slips and saleswomen do not. Again, this is a matter of job detail requiring merely the checking of spaces on the back of the alteration slip or making simple notations on it.

Dr. S. Herbert Unterberger testified as an expert that the work performed by salesmen and salesladies did not require equal skill, equal effort and equal responsibility. Mr. Thomas Kearney testified to the contrary. It is not necessary to evaluate this testimony. The determination whether the jobs of salesmen and saleswomen were substantially equal depends primarily upon a weighing of the testimony of fact witnesses, and the opinion of experts is of little help in resolving the question.

After listening to voluminous non-expert testimony for days on end concerning the differences and similarities between the jobs of salesmen and salesladies, the conclusion is warranted that such differences as existed were at best only incidental to the job of each when considered in its totality. The skill, effort and responsibility of each were substantially equal.

Plaintiff has borne the burden of proving by a preponderance of the evidence that defendants have discriminated between salesmen and salesladies by paying to the latter wages at a lesser rate than paid to the former for equal work on jobs that required equal skill, effort and responsibility. Plaintiff has thus made out a prima facie case against defendant for violating the Equal Pay Act. Shultz v. Wheaton Glass Co., *supra*, p. 266.

Even though this be so, if the pay differential was justified by factors other than sex, as defendants claim, defendants have a valid defense under the Act. The defense is an affirmative one which the defendants have the burden of proving. Shultz v. Wheaton Glass Co., *supra*, p. 266. This must be done by a preponderance of the evidence.

4) Factors Other Than Sex

Defendants contend that the Act is violated only if a wage differential is based solely on sex and is justified by no other factor. This contention is unacceptable. Properly interpreted, the Act means that if the differential in pay is, in whole or in part, based upon sex, it is not based upon factors other than sex. Only if sex plays no part in the wage differential is it beyond the condemnation of the Act. 29 C.F.R. § 800.142.

Contrary views have been expressed. In Kilpatrick v. Sweet, 262 F.Supp. 561, 564 (M.D.Fla.1967) the court said that "if there were any other factors other than sex upon which a difference in wages was based, then no violation of the

law could be found." See also Shultz v. Kentucky Baptist Hospital, 62 CCH Lab.Cas. 44,117, 44,123 (W.D.Ky.1969). This construction of the Act is not required by its language and if adopted evasion of the Act would be easy and its remedial purpose would be thwarted.

Defendants argue that economic considerations were the sole reasons for the compensation differential between salesladies and salesmen and that sex had nothing to do with it. The difference in merchandise carried in the men's department and the relatively greater benefits which it is said that defendants experienced by the operation of that department lie at the root of this argument.

The merchandise carried in the men's department differed from that in the women's department in price, quality, style, markup and markdown. On the average more merchandise in the men's department is in the higher price range and of better quality than in the ladies' department; on the average the merchandise in the men's department carries a considerably higher markup and lesser markdown than that in the ladies' department; and, of course, styles in the men's merchandise differ from styles in the ladies' merchandise.

Defendants point to the fact that the sales in the men's department exceeded by several fold those in the ladies' department, and that the percentage of gross profit to sales in the former was substantially greater than in the latter. See Dx 17, p. 1:[10]

Re: GREENBANK ROAD STORE

SCHEDULE OF SALES AND GROSS PROFITS BY DEPARTMENT

| Fiscal Year Ended June 30 | Men's and Boys' Clothing Dept. | | | Ladies' and Girls' Clothing Dept. | | |
|---|---|---|---|---|---|---|
| | Sales | Gross Profit | Gross Profit % | Sales | Gross Profit | Gross Profit % |
| 1963 | $210,639.48 | $ 85,328.48 | 40.51 | $177,742.17 | $58,547.13 | 32.92 |
| 1964 | 178,867.50 | 73,608.08 | 41.16 | 142,788.22 | 44,612.12 | 31.24 |
| 1965 | 206,472.93 | 89,930.00 | 43.55 | 148,252.90 | 49,608.08 | 33.46 |
| 1966 | 217,765.79 | 97,447.54 | 44.74 | 166,479.47 | 55,463.29 | 33.31 |
| 1967 | 244,922.09 | 111,498.79 | 45.52 | 206,680.27 | 69,190.04 | 33.47 |
| 1968 | 263,663.53 | 123,681.60 | 46.90 | 230,156.63 | 79,846.92 | 34.69 |
| 1969 | 316,242.41 | 148,001.30 | 46.79 | 254,379.22 | 92,686.87 | 36.43 |

In establishing pay rates Robert Hall did not consider the nature of the specific merchandise sold by individual employees and made no attempt to relate the specific wages of specific employees to specific merchandise. Silbert, the senior vice president and treasurer of Robert Hall, testified that the compensation differential at Greenbank was based upon the experience which Robert Hall had in its other stores and involved solely economic considerations which reflected the difference in merchandise sold. Greenbank was opened in 1962. In the case of every one of its other stores Robert Hall had learned that on the average each salesman generated per hour of work more sales dollars and more gross profit than the average saleswoman. Silbert said that it was solely because of this experience that Robert Hall, which fixed compensation policies for all of its retail stores, determined to pay the differential at Greenbank. He said that the decision was simply a forward judgment based upon past facts.

The defendants' prognostication that at Greenbank salesmen on the average per hour of work would sell more merchandise in terms of dollars and produce

10. The figures on the first page of Dx 17 were subject to certain minor adjustments as shown on the second and third pages of Dx 17.

more gross profit than saleswomen was borne out by each year's operation at Greenbank. See Dx 41, as supplemented by the Court. [11]

### SCHEDULE OF HOURLY SALES, EARNINGS AND GROSS PROFIT

| Year | Sales Per Hour | Excess M over F | Earnings Per Hour | Excess M over F | Gross Profit Per Hour | Excess M over F |
|------|------|------|------|------|------|------|
| MEN'S & BOYS' | | | | | | |
| 1963 | 38.31 | 40% | 2.18 | 25% | 15.52 | 72% |
| 1964 | 40.22 | 32% | 2.46 | 32% | 16.55 | 74% |
| 1965 | 54.77 | 64% | 2.67 | 48% | 23.85 | 114% |
| 1966 | 59.58 | 73% | 2.92 | 50% | 26.66 | 134% |
| 1967 | 63.14 | 71% | 2.88 | 45% | 28.74 | 133% |
| 1968 | 62.27 | 70% | 2.97 | 47% | 29.21 | 127% |
| 1969 | 73.00 | 77% | 3.13 | 45% | 34.16 | 127% |
| LADIES' & GIRLS' | | | | | | |
| 1963 | 27.31 | | 1.75 | | 9.00 | |
| 1964 | 30.36 | | 1.86 | | 9.49 | |
| 1965 | 33.30 | | 1.80 | | 11.14 | |
| 1966 | 34.31 | | 1.95 | | 11.43 | |
| 1967 | 36.92 | | 1.98 | | 12.36 | |
| 1968 | 37.20 | | 2.02 | | 12.91 | |
| 1969 | 41.26 | | 2.16 | | 15.03 | |

This tabulation is based on averages and does not reflect individual performances by the sales personnel. Standing alone, the greater amount paid to the average salesman per hour is amply justified by the greater amount of dollar volume per hour and gross profits per hour generated by the average salesman. These average figures, however, are less meaningful than they appear to be on the surface when other statistical data of record is analyzed with an eye to performance by and pay to full-time and part-time personnel, respectively.

This data may be found in defendants' exhibits 20–21 for the period January 26, 1969—April 15, 1969 and Dx 22–23 for the period August 10, 1969—October 18, 1969. During these two periods Greenbank had only one full-time salesman, Robbins, and one full-time saleswoman, Donofrio. For the January 26, 1969—April 15, 1969 period Robbins earned $2.61 per hour, as against $2.14 per hour for Donofrio, incentive compensation being excluded in each instance.[12] Robbins' compensation was, therefore, 22% more than Donofrio's. The same exhibits show that for the same period Robbins was responsible for $83.40 per hour of sales as against $50.53 by Donofrio, or 65% more than Donofrio. A like comparison between Robbins and Donofrio for the period August 10, 1969 through October 18, 1969, Dx 22 and 23, reveals that whereas Robbins generated 43% more gross sales per hour his compensation per hour was only 14% more per hour than Donofrio's, again excluding incentive pay.[13]

The discussion thus far relates to a comparison between the wage rate of an individual full-time salesman and an individual full-time saleswoman for two limited periods in 1969. No comparable statistics are available of record for other periods. Sales checks made out by the individual sales employees from which dollar volumes could be ascertained were destroyed promptly after the

11. The supplementation by the Court consists of the addition to Dx 41 of three columns which show the percentages by which the sales per hour, earnings per hour and gross profits per hour of the average salesman exceeded those of the average saleslady.

12. The matter of incentive differential is discussed, infra p. 1278.

13. These percentages are not shown on Dx 20–23 but represent computations by the Court from the exhibits.

**1278**

district manager reviewed them. It was only a fortuitous circumstance which caused the sales slips upon which defendant's exhibits 20–23 were based to survive. However, there is nothing in the record to indicate that the periods in 1969 reflected in Dx 20–23 were not typical.

■ So far as full-time employees are concerned, and apart from incentive payments, the pay differential in favor of salesmen as against saleswomen (thus far only one of each) was based upon economic considerations and in no way upon sex.

The wage compensation disparity between part-time salesmen and part-time saleswomen, excluding from consideration incentive payments, presents a different story. The part-time salesmen for the period January 26, 1969 to April 15, 1969 on the average were responsible for $44.79 of sales per hour as against $37.47 by saleswomen, or 20% more.[14] The average part-time salesman was paid $1.93 per hour in wages as against $1.61 per hour to part-time saleswomen, or 20% more.[15] For the period August 10, 1969 to October 18, 1969 the part-time salesmen generated on the average 46.43 dollars of sales per hour as against 43 dollars by saleswomen, or 8% more. The average salesman was paid during the period $1.91 per hour in wages as against $1.65 per hour to saleswomen, or 16% more.[15]

In the case of part-time sales personnel no records of sales per hour were introduced in evidence for periods of time other than the two discussed. There is no suggestion that there was a deliberate destruction of records by defendants other than in the normal course of business. It is reasonable to infer that had the records been available their disclosure would not have been significantly different from that shown by the analysis of Dx 20–23, just discussed.

■ The conclusion is warranted that the compensation disparity (apart from incentives) in favor of the part-time salesmen cannot be supported by any economic benefits which defendants received from the job performances of the salesmen. The difference in wage rates paid to the salesmen and saleswomen was not based upon factors other than sex.

This is borne out by individual compensation and economic benefits comparisons. Two of Greenbank's part-time female employees, Alice Raker and C. Jarrell, were responsible for a higher per hour dollar volume of sales than three of the part-time male employees, McGonegal, Law and Layton, during the period from August 10, 1969 to October 18, 1969. A division of Jarrell's gross earnings (less incentive) by hours worked and a similar computation for the part-time salesmen discloses that Jarrell received a lower hourly rate than all three of these part-time salesmen, even though her gross sales per hour were more than that made by three of the five part-time salesmen. See Dx 22 and 23. Silbert conceded that it was possible in a given location that an excellent saleswoman might generate more sales than a very poor salesman, although he said that normally this would not happen. At Greenbank this did occur.

■ Incentive compensation presents its own unique problem and necessitates separate consideration. Its complex nature and the purposes it was designed to serve have been previously discussed. Here it need only be noted that the incentives paid depended upon differences in the style, quality, price and markup between the merchandise sold in the two departments. Except as these factors were themselves based upon the sex of the customers, the incentive differentials were not based in any way upon sex, and were sanctioned by 29 C. F.R. § 800.116(e).[16] Although the ex-

---

14. These dollar figures and percentages have been computed by the Court from Dx 20–21.

15. See preceding footnote.

16. Section 800.116(e) reads:
    (e) *Commissions.* The establishment of

ample given in this regulation presupposes the hiring of males and females indiscriminately in each of two shoe departments, it is not for this reason irrelevant to the instant case. Were this a case in which the defendant had arbitrarily employed only females in the department paying the lower commissions, it might be. But this did not occur. Here the necessity of close bodily contact between customers and sales personnel made it logical and necessary for salesmen to be employed in the men's department and salesladies in the women's department.

In its operation the ratio of incentive pay to gross sales was only about .2% more in the case of salesmen than in the case of saleswomen. This compensation differential distinction was based solely upon factors other than sex.

### Conclusion

■ Plaintiff is entitled to an injunction restraining defendants from (a) further violating the Equal Pay Act at the Greenbank store, and (b) from withholding back wages due salesladies at the Greenbank store because of violation of the Equal Pay Act. The parties have agreed to attempt to stipulate the amount of back wages which defendants must pay.

■ 29 U.S.C. § 255 bars all claims for unpaid "minimum wages" except those accruing within two years prior to the commencement of an action unless the violation of the Act was willful. This provision is applicable to unpaid wage claims resulting from sexual discrimination. 29 U.S.C. § 206(d) (3). Here the violation of the Act was not willful. The complaint was filed on December 6, 1966. All claims for back wages accruing prior to December 6, 1964 are therefore barred.

■ Plaintiff claims that defendants are liable for interest on the wages which should have been paid to the salesladies but were not. Without passing upon the power of the Court to make an award of interest,[17] it is denied as a matter of discretion.

The jobs performed by the salesmen and salesladies were not identical. Defendants could have interpreted the Act in good faith to apply only if they were. *Cf.* Hodgson v. American Can Co., 317 F.Supp. at 161–162. Not until three years after the action was begun was there a definitive holding in this Circuit in Shultz v. Wheaton Glass Co., *supra,* that the Act was intended to reach jobs that were substantially equal and that they need not be identical to be subject to its terms. 421 F.2d at 265.

Furthermore, the experience of Robert Hall at its other stores reflecting greater benefits from the efforts of salesmen than salesladies was prima facie justification for the distinction in wage rates at Greenbank. Defendants cooperated

different rates of commission on different types of merchandise would not result in a violation of the equal pay provisions where the factor of sex provides no part of the basis for the differential. For example, suppose that a retail store maintains two shoe departments, each having employees of both sexes, that the shoes carried in the two departments differ in style, quality, and price, and that the male and female sales clerks in the one department are performing 'equal work' with those in the other. In such a situation, a prohibited differential would not result from payment of a lower commission rate in the department where a lower price line with a lower markup is sold than in the other department where the merchandise is higher priced and has a higher markup, if the employer can show that the commission rates paid in each department are applied equally to the employees of both sexes in the establishment for all employment in that department and that the factor of sex has played no part in the setting of the different commission rates.

17. Power to award interest was assumed to exist without discussion in Shultz v. Wheaton Glass Co., 319 F.Supp. 229 (D.N.J.1970), decision upon remand following Shultz v. Wheaton Glass Co., 421 F.2d 259 (3d Cir. 1970). The power to make such an award was denied in Hodgson v. American Can Co., 317 F.Supp. 152, 159–160 (W.D.Ark.1970).

with the Government and attempted to explain to it the bases for their compensation policy. In continuing it they acted upon the advice of counsel.

Defendants have acted in good faith and upon reasonable grounds in compensating sales employees in the men's department at higher rates than sales employees in the ladies' department. Although some of the salesladies were paid less than their due under the law, equitable considerations on balance support a denial of an award of interest on the back pay to which they are entitled.

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR REARGUMENT

The motion of defendants for reargument asserts that the Court, while comparing the amount of sales per hour generated by the part-time sales force, erroneously overlooked the most significant fact of economic benefit to defendants, namely the amount of profits produced per hour by the part-time sales force.

The sales per hour comparisons set forth in the opinion were based upon the sales generated by each of the part-time sales personnel. Defendants' motion presents no data from which the amount of profit produced per hour by each of the part-time sales personnel can be calculated. Defendants endeavor to present such a comparison by relying upon computations premised basically upon Dx 17. This exhibit reveals that in 1969 [18] the gross profit of the men and boys' department was 46.79% of the department's sales, and that the gross profit of the ladies' and girls' department was 36.43% of that department's sales. Defendants' arguments all proceed from these two statistics. However, they provide no clue as to what the gross profit per hour may have been upon the sales generated by the individual part-time sales personnel. Yet, it is this latter comparison which is the significant one,

just as the per hour sales comparisons of the individual part-time personnel (discussed in the opinion) was the meaningful one.

The motion for reargument is denied.

---

18. 1969 was the year in which the two periods occurred in which sales volume of the individual part-time sales personnel was compared.